# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TEVIN CAGLE & GERALD ROBINSON | : | CIVIL ACTION NO. 3:24-cv-00154 (JCH) |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| DURO-HILEX POLY, LLC | : | |
| | : | |
| Defendant | : | APRIL 15, 2024 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Duro-Hiley Poly, LLC ("DHP"), a plastic and paper bag manufacturer, hired Plaintiff Tevin Cagle ("Cagle") as a Packer in August 2021, promoted him to Bag Machine Operator in November 2021, and suspended his employment for one week in December 2022 for <u>insubordination</u>.  DHP hired Cagle's friend, Plaintiff Gerald Robinson ("Robinson"), as a Packer in November 2021, promoted him to Bag Machine Operator that same month, and terminated his employment in August 2022 for <u>excessive absenteeism</u> in violation of DHP's Attendance Policy.

Plaintiffs filed this lawsuit against DHP in January 2024 claiming race/color discrimination (Counts One through Four) and retaliation (Counts Five and Six), all in violation of the Connecticut Fair Employment Practices Act ("CFEPA").  Cagle also claims disability discrimination (for a vision impairment) in violation of CFEPA.  These claims fail, however, for any number of reasons:

- Plaintiffs' disparate treatment race/color discrimination claims fail because neither can establish a *prima facie* case (see infra § IV.A.1);

- Plaintiffs' disparate treatment race/color discrimination claims also fail because they cannot show DHP's reasons for the adverse actions at issue were false and pretextual (see infra § IV.A.2);

- Plaintiffs' race/color-based hostile work environment claims fail because they cannot show sufficiently severe or pervasive discriminatory conduct, whether within or outside the

applicable limitations period (see infra § IV.A.3);

- Plaintiffs' retaliation claims fail because neither can show DHP's reasons for the adverse actions at issue were false and pretextual (see infra § IV.B.1);

- Cagle's disparate treatment disability discrimination claim fails because he cannot establish a *prima facie* case (see infra § IV.C.1);

- Cagle's disparate treatment disability discrimination claim fails because he cannot show DHP's reason for his suspension was pretextual (see infra § IV.C.2);

- Cagle's failure to accommodate claim fails because he cannot show DHP denied him any accommodation request, whether within or outside the applicable limitations period (see infra § IV.C.3); and

- Cagle's disability-based hostile work environment claims fail because he cannot show sufficiently severe or pervasive discriminatory conduct, whether within or outside the applicable limitations period (see infra § IV.C.4).

As explained more fully below, no genuine issue of material fact exists as to any of Plaintiffs' legal claims and, in light of the undisputed and/or undisputable evidence, DHP is entitled to judgment as a matter of law. The Court, therefore, should grant DHP's motion for summary judgment in its entirety and enter judgment in its favor on all counts.

## I.    RELEVANT FACTUAL BACKGROUND[1]

DHP, a wholly-owned subsidiary of Novolex Holdings, LLC ("Novolex"), is a plastic and paper bag manufacturer. (See Ex. 1, Affidavit of Christine Korzenko ("Korzenko Aff.") ¶ 3; Ex. 2, Deposition of Tevin Cagle ("Cagle Dep.") at 51; Ex. 3, Deposition of Gerald Robinson

---

[1] DHP assumes Plaintiffs' well-plead allegations are true for purposes of this motion, but reserves the right to contest any of them should this matter proceed beyond this motion. Moreover, DHP notes Plaintiffs filed their administrative charges with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and U.S. Equal Employment Opportunity Commission ("EEOC") on May 5, 2023 (Cagle) and May 15, 2023 (Robinson). (See infra § III.) Accordingly, Plaintiffs' claims are only timely to the extent they base them on events allegedly occurring on or after July 9, 2022 (for Cagle) and July 19, 2022 (for Robinson). See Gupte v. Uber Tech., No. 3:24-cv-02037 (VAB), 2025 WL 904741, at *4 (D. Conn. Mar. 24, 2025) (aggrieved party must file CFEPA claim with CHRO "within 300 days of when the unlawful conduct occurred" or the claim is time-barred).

("Robinson Dep.") at 55.)[2]  Novolex acquired the Meriden facility at issue in this litigation, which manufactures paper bags, in July 2021.  (See Ex. 1, Korzenko Aff. ¶ 8; Ex. 5, Deposition of Richard Bolognese ("Bolognese Dep.") at 13.)

### A.    DHP Hires Plaintiffs as Packers in Mid to Late 2021 and Production Manager Bolognese Promotes Them to Bag Machine Operators in November 2021.

DHP hired Cagle (African-American/black) on August 6, 2021 and Robinson (African-American/black) on November 15, 2021 as Packers.  (See Doc. No. 48, Am. Compl. ¶¶ 6-8; Ex. 2, Cagle Dep. at 16-17 & 52-53; Ex. 3, Robinson Dep. at 20 & 56-57.)[3]  Packers generally work on the end of the machine where the bags come out, inspect them for deformities, stop the machine as needed when deformities occur and inform the Bag Machine Operator, make minor adjustments to the machine as needed, package the bags for shipment, and sweep the floor and throw out trash. (See Ex. 2, Cagle Dep. at 53-54; Ex. 3, Robinson Dep. at 57.)

Production Manager Richard Bolognese ("Bolognese") (Caucasian/white) promoted

---

[2] DHP maintains an equal employment opportunity policy, a discrimination and harassment reporting policy, and a policy asserting its compliance with the Americans with Disabilities Act ("ADA").  (See Ex. 1, Korzenko Aff. ¶¶ 4 & 5; Ex. 2, Cagle Dep. at 75-84; Ex. 4, Employee Handbook Excerpts ("Handbook") at 9 & 13-14.)  DHP also maintains an open-door policy, which affords employees various avenues to raise concerns, and encourages employees to share their concerns and resolve problems through management without fear of retaliation.  (See Ex. 1, Korzenko Aff. ¶¶ 4 & 6; Ex. 2, Cagle Dep. ay 75-84; Ex. 4, Handbook at 8.)  The "Ethics and Compliance Helpline" is also an avenue for employees to report issues of workplace safety and other employment policy violations.  (See Ex. 1, Korzenko Aff. ¶¶ 4 & 7; Ex. 2, Cagle Depo. at 75-84; Ex. 4, Handbook at 8.)

[3] Cagle alleges he has "extremely impaired vision" and he "disclosed his visual impairment to Defendant during his interview, and at the time of his hire both to" Senior HR Manager Christine Korzenko ("Korzenko") (Caucasian/white) (even though she had not yet even started employment with DHP at the time of his hire) and Bolognese, but that he did not need, or request, any accommodation.  (See Doc. No. 48, Am. Compl. ¶¶ 9 & 21; Ex. 1, Korzenko Aff. ¶¶ 2 & 3; Ex. 2, Cagle Dep. at 30 & 37-38.)  Cagle also alleges he "reminded his managers and supervisors of his visual impairment at various times throughout his employment."  (See Doc. No. 48, Am. Compl. ¶¶ 9 & 21.)

Plaintiffs to the position of Bag Machine Operator in November 2021. (See Doc. No. 48, Am. Compl. ¶¶ 6, 16, & 22; Ex. 2, Cagle Dep. at 64; Ex. 3, Robinson Dep. at 63.) As Bag Machine Operators, Plaintiffs essentially were responsible for running the machines that produced the bags:

> As a machine operator I am fully responsible for loading the said [sic] roll onto the back of the machine, the bladder, for it to rotate properly. I am in charge of filling all stations, i.e., glue, ink, hot melt, any liquid, which would be, like hydraulic fluid. I'm responsible for maintaining cleanliness of that machine from front to back and the side panels where the hot melt runs down. I'm required to monitor that the bag stays in its proper formation as it's forming and coming down the line, fixing any blemishes as soon as my packer points them out or if I spot them before them. And overall just making sure that that machine runs without going down for the entirety of my shift, unless it's a . . . job change, scheduled break, or there's a malfunction.

(See Ex. 2, Cagle Depo. at 66; Ex. 3, Robinson Dep. at 66 (run and maintain the machine).)[4] In the event of a malfunction, Plaintiffs were responsible for informing the "Adjuster" on duty, who was responsible for fixing it. (See Ex. 2, Cagle Dep. at 59-62; Ex. 3, Robinson Dep. at 66-67.)

Plaintiffs were supervised by the Shift Supervisor on duty (from July 2022 onward, David Signore ("Signore") (Caucasian/white)) and reported to Bolognese. (See Doc. No. 48, Am. Compl. ¶¶ 15-16 & 43; Ex. 1, Korzenko Aff. ¶ 9; Ex. 2, Cagle Dep. 58-59; Ex. 3, Robinson Dep. at 62.) Bolognese, in turn, reported to the Plant Manager. (See Doc. No. 48, Am. Compl. ¶ 17; Ex. 1, Korzenko Aff. ¶ 9; Ex. 2, Cagle Dep. at 59; Ex. 3, Robinson Dep. at 62.) Through October 2022, the Plant Manager was Raviendre Kailan ("Kailan") (Asian/Indian).[5] (See Doc. No. 48, Am. Compl. ¶ 17; Ex. 1, Korzenko Aff. ¶ 10; Ex. 2, Cagle Dep. at 59; Ex. 3, Robinson Dep. at 62.) DHP replaced Kailan with Anthony Kittrell (African-American/black). (See Doc. No. 48, Am.

---

[4] Cagle testified that, after he became a Bag Machine Operator, he complained that the labels for some of the buttons on his machine were faded and he asked for them to be replaced, but they were not replaced. (See Ex. 2, Cagle Dep. at 39.)

[5] In or about November 2022, Kailan was promoted to Senior Manager – Manufacturing, Eastern/Central Region. (See Ex. 1, Korzenko Aff. ¶ 11; Ex. 6, Deposition of Raviendre Kailan ("Kailan Dep.") at 50.)

Compl. ¶ 66; Ex. 1, Korzenko Aff. ¶ 12; Ex. 2, Cagle Dep. at 69-70 & 228.)

**B.**      **Plaintiffs Complain to Bolognese that Indian and Hispanic Coworkers Stare at Them, Do Not Speak English with Them, and Make Adjustments to Their Machines Without Their Permission.**

Plaintiffs allege their "Indian and/or Gujarati or Hindi speaking [co]workers[6] engaged in staring at" them.  (See Doc. No. 48, Am. Compl. ¶ 24.)  At his deposition, Cagle testified "the entire factory" stared at him, but specifically identified six Indian coworkers and one Mexican coworker he claims stared at him and/or Robinson "on a daily basis."[7]  (See Ex. 2, Cagle Dep. at 111-18.)  At his deposition, Robinson identified three Indian coworkers and a Mexican coworker he claims frequently stared at him.  (See Ex. 3, Robinson Dep. at 99-105, 121-22, & 130; see also Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Interrog. No. 10)).)  While Cagle admits the obvious proposition that he does not know whether such coworkers stared at other employees outside of his presence (see Ex. 2, Cagle Dep. at 114-15), Robinson maintains he can assume they did not stare at others based on his having seen their workload and, on several non-specific occasions, he stared back and watched them stare at him (see Ex. 3, Robinson Dep. at 101-04).

While Plaintiffs admit their Indian and Hispanic coworkers are not native English speakers and speak in broken English with a thick accent, they complain that such workers did not speak English with them.[8]  (See Doc. No. 48, Am. Compl. ¶ 24; Ex. 2, Cagle Dep. at 31 & 103-06; Ex.

---

[6] The majority of employees at the facility are of Indian background, and roughly 30% to 40% require assistance translating from their native language – Gujarati – to English.   (See Ex. 1, Korzenko Aff. ¶ 13; Ex. 5, Bolognese Dep. at 52; Ex. 6, Kailan Dep. at 76-77.)

[7] When asked whether he thought these coworkers were ill-intentioned, Cagle testified, "I don't know," and that he simply ignored it until his hours were reduced (see infra § I.C & D), after which he complained about it.  (See Ex. 2, Cagle Dep. at 114.)

[8] Other employees reported to Bolognese that they were "having the same problem, communications" with native Gujarati and/or Hindi-speaking employees.  (See Ex. 5, Bolognese Dep. at 39 & 42.)

3, Robinson Dep. at 130 & 209.)  On this issue, Cagle mainly focuses on coworker Narendra Patel ("Narendra"), who was initially assigned to train him as a Bag Machine Operator.  (See Doc. No. 48, Am. Compl. ¶ 25; Ex. 2, Cagle Dep. at 104-05 & 111; Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Interrog. No. 9).)  He complains Narendra, in training him, did not speak English and relied, in essence, on hand gestures and demonstrations.[9]  (See Doc. No. 48, Am. Compl. ¶ 25; Ex. 2, Cagle Dep. at 106; Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Interrog. No. 9).)  Cagle also complains Narendra did not slow down his gestures and demonstrations when Cagle pointed to his eyes, which Cagle intended to mean he had vision issues.[10]  (See Ex. 2, Cagle Dep. at 30-31.)  Cagle alleges he learned Narendra could speak English in February 2022, when he overheard him say something in English to Bolognese.[11]  (See Doc. No. 48, Am. Compl. ¶ 25; Ex. 2, Cagle Dep. at 105-09.)  Cagle, therefore, concludes Narendra "refused" to speak English with him.[12]  (See Doc. No. 48, Am. Compl. ¶ 25; Ex. 2, Cagle Dep. at 108-10.)  Robinson says the same of the coworker who trained him, Mahesh.  (See Ex. 3, Robinson Dep. at 69.)  He also alleges certain

---

[9] Nonetheless, Cagle admits Narendra trained him "[t]o the best of his ability without speaking English, I guess, yes."  (See Ex. 2, Cagle Dep. at 105.)

[10] Cagle alleges that, at the end of 2021, he complained to Bolognese, who told Narendra (and another Adjuster who subsequently trained him, Kalpesh Patel ("Kalpesh")) "they need to show me more, they need to take time to explain what's going on" to which they both nodded), and they eventually (although not as quickly as Cagle would have liked) trained Cagle, in his view, "better."  (See Ex. 2, Cagle Dep. at 34.)

[11] Robinson testified he learned Narendra could speak English at some unspecific point when he overheard him say something in English to an Indian coworker, after which Robinson ran and told Cagle, "oh shit, this motherfucker's really speaking English in here."  (See Ex. 3, Robinson Dep. at 127-28.)

[12] When asked at his deposition whether he thought Narendra was ill-intentioned in such "refusal," Cagle answered affirmatively, but attributed it to his conclusion that Narendra "didn't want to train me because that meant that I would take over that machine."  (See Ex. 2, Cagle Dep. at 110.)

other coworkers he believed only spoke Hindi also spoke English.[13]  (See id. at 126-30.)

Finally, Plaintiffs allege they "experienced instances where packers of Indian or Mexican heritage made changes to their machines without permission, which could cause a paper break, a glue spill, or cause creation of defective bags and other production issues." (See Doc. No. 48, Am. Compl. ¶ 40; Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Interrog. Nos. 9 & 13).)  At his deposition, Cagle identified three such individuals:  Sejal, Harshika, and Jaymatti.  (See Ex. 2, Cagle Dep. at 91-98.)  As to Sejal, for example, Cagle testified:

> So the way you control the paper movement is by a turning wheel.  To make the paper move left or right you have to go the opposite direction.  So my paper was slipping off the forming board.  I had just put it on, so it needed time to form completely to make a bag.  Sejal moved it to the right making the paper completely come off the forming board and causing a paper break, which meant I had to reset the machine.  I reported it to Kalpesh and her husband [also an Adjuster].  He said it's no big deal just put the paper back on.  Packers aren't supposed to touch the machine in case something like that happens.

(See id. at 92.)[14]  Robinson testified that Sejal, Jaymatti, Laura, Reyna, and Jasmine similarly made changes to his machine.  (See Ex. 3, Robinson Dep. at 94-95.)  As to Laura, for example, Robinson testified:

> She would constantly adjust the seam line on the machine, and specific times she kept stopping my machine, must have been over five, six times in one night, and when she was reprimanded about it on why she was going straight to Kalpesh instead of me, because she had to keep going around the warehouse to find him,

_____

[13] For one such coworker, Sejal, Robinson once overheard her speaking English to a black employee, Mercedes, when Sejal was training her (see Ex. 3, Robinson Dep. at 129), which obviously undermines his claim that any "refusal" to speak with him in English had anything to do with his race.

[14] When asked whether he believed Sejal acted with ill intention, Cagle testified:

I'm not sure.  I feel like maybe she thought she was being helpful, but at the time it wasn't, and then had the paper break caused—when the paper break broke due to her moving the machine, there was no apology, there was no insertion of it was me, it wasn't the operator, it was just vacate my area until it was ready to go again.

(See Ex. 2, Cagle Dep. at 93.)

she decided to cry, and then they took her off my machine and stopped pairing her with me.

(See Ex. 3, Robinson Dep. at 112.)[15]  Plaintiffs also allege that, at various and largely non-specific times, they noticed something was changed and/or adjusted on their machine and, while they do not know who did it, when, or why, they "came to believe" coworkers were trying to "sabotage" their machine.[16]  (See Doc. No. 48, Am. Compl. ¶ 40; Ex. 2, Cagle Dep. at 98-100 & 162-68; Ex. 3, Robinson Dep. at 109-10, 197, & 209; Ex. 7, Pl's Resp. to 1st Set of Interrogs. (Resp. to Interrog. Nos. 9 & 13).)

In or about February 2022, Plaintiffs complained to Bolognese about these issues.  (See Doc. No. 48, Am. Compl. ¶ 27; Ex. 7, Pl's Resp. to 1st Set of Interrogs. (Resp. to Interrog. No. 9).)  As to the staring issue, Bolognese told them such individuals stared at him too, suggesting it was just how they behave.[17]  (See Ex. 2, Cagle Dep. at 174.)  Bolognese also asked them to "be patient and work with us, this is the culture, things will change."[18]  (See id. at 102.)  Moreover,

---

[15] Cagle also complained that certain Packers turned off his machine.  (See Ex. 2, Cagle Dep. at 96-98.)  At one point, he texted Robinson about one female Packer: "That's twice this bitch turned off my machine today."  (See Ex. 8, Text Messages at 76.)

[16] That said, Cagle admits it is "equally possible that somebody innocently made a change or brushed up against it or did something unintentionally that resulted in the state in which [he] found [his] machine," but said he "feel[s] if it happens frequently, that that's not a mistake, somebody's purposely doing this."  (See Ex. 2, Cagle Dep. at 164.)  When asked at his deposition why he believes coworkers were trying to "sabotage" his machine, Robinson testified: "I've been incarcerated, for instance, where you can tell racial tensions and racial divide very easily. . . ." (See Ex. 3, Robinson Dep. at 109-10.)

[17] As Bolognese testified: "Basically I told them they stare at anybody, they stare at me, they stare at everybody that comes in there.  That's what they do."  (Ex. 5, Bolognese Dep. at 47-49.)

[18] Cagle asked Bolognese what he meant by "the culture" and Bolognese said "before Novolex owned the company it ran very different, there wasn't a lot of structure, a lot of them are used to operating and running the way that they were showing us, which by company standard was the wrong way" and " this is going to take a while, we're just taking over this company, you have

coworker and Adjuster Kalpesh took over training responsibility for Cagle, with whose training Cagle had no issues.[19]  (See id. at 119-20.)

### C.     In February 2022, Kailan and Bolognese Hold Meeting with Machine Operators to Discuss "Change in Culture" and Reduction in Hours.

In February 2022, shortly after Kailan's hire, he and Bolognese held a meeting with all Machine Operators on first and third shifts.  (See Doc. No. 48, Am. Compl. ¶ 28; Ex. 6, Kailan Dep. at 84; Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Interrog. No. 9).)  During this meeting, Bolognese "expressed a need to 'change the culture.'"  (See Ex. 2, Cagle Dep. at 102-03; Ex. 3, Robinson Dep. at 138-39; Ex. 7, Pls.' Resp to 1st Set of Interrogs. (Resp. to Interrog. No. 9).)  As Robinson explained, the topic of discussion was "[a]bout how things were going to be changing at the plant, how they were going to be changing the way things are done, and the overall culture in there was going to be different," including "[t]he way people interact with each other as far as training and locks on toolboxes, and as far as communication, there wasn't going to be a stone wall environment."[20]  (See Ex. 3, Robinson Dep. at 138-39.)  Robinson says that, during the meeting, he "asked specifically about the staring, and specifically about the manipulation of the

---

to give us time to fix, quote unquote, the bad behavior that's already in here."  (See Ex. 2, Cagle Dep. at 102-03.)

[19] That said, Cagle alleges Kalpesh (like Narendra before him) did not slow down his demonstrations, notwithstanding the fact that Cagle pointed to his eyes, which he intended to mean he had vision problems.  (See Doc. No. 48, Am. Compl. ¶¶ 26 & 33; Ex. 2, Cagle Dep. at 31.)

[20] As Cagle explained, by "culture," Bolognese referred to "how the factory runs" (insofar as, prior to Novolex acquiring DHP, "it was ran very different, there wasn't a lot of structure, a lot of them are used to operating and running the way that they were showing us, which by company standard was the wrong way . . . ."), not race.  (See Ex. 2, Cagle Dep. at 102-03 ("I don't feel that they were looking at it from a racial standpoint.").)  As Kailan explained, he focused on the "safety culture in the facility," "the equipment training and equipment maintenance that needed to get completed," and the "corporate culture," meaning "[m]aking sure that we are treating everyone equally, making sure that we are treating everyone with respect, and that we support each other in driving teamwork across all of our employees."  (See Ex. 6, Kailan Dep. at 85.)

machine," that is, "[w]hen was a packer supposed to touch it, when were they supposed to stop the machine?" (See id. at 139.)  In response, Bolognese told Robinson to "hang in there and to deal with it while changes are being made." (See id.)

During the same meeting, Bolognese also announced that Bag Machine Operator shifts would be reduced from twelve to eight hours, and that such reduction would be phased in on a machine-by-machine basis. (See Doc. No. 48, Am. Compl. ¶ 29; Ex. 2, Cagle Dep. at 125-26; Ex. 3, Robinson Dep. at 140.)  As Cagle explained, "Richard announced that there was going to be reductions on machines due to the fact that work has slowed down, like the job requests coming in had slowed down for certain bags . . . ."[21] (See Ex. 2, Cagle Dep. at 126.)

After the meeting, Bolognese and Kailan met with Cagle and Robinson alone. (See Doc. No. 48, Am. Compl. ¶ 30; Ex. 2, Cagle Dep. at 126-27; Ex. 3, Robinson Dep. at 140-43; Ex. 7, Pls.' Resp. to 1st Set of Interrogs. (Resp. to Req. No. 9).)  As Cagle explained:

> [Bolognese] and [Kailan] basically sat us down and repeated the same things that they had been repeating, like they're happy that we're showing patience with the way that the factory's going, they need us to stick with them a little longer, they're doing the best they can, they see us going far in this company as long as we do what we're supposed to do, i.e., like our job-wise, and just keep being patient, things are going to change.

(See Ex. 2, Cagle Dep. at 126-27.)  Robinson also said he did not feel safe because coworkers had razor blades (for legitimate job purposes, as tools of the trade) stored in "random spots." (See Ex. 3, Robinson Dep. at 141-42.)  Robinson also complained about his pay.[22] (See id. at 74-75.)

---

[21] Kailan explained he decided to reduce Bag Machine Operator hours "[b]ecause we had employees working five 12-hour days plus Saturdays for eight hours so it was week after week employees were working 68 to 70 hour weeks and we needed to take care of our employees" so they "instead starting hiring employees and training them on the machine so we can get back to a standard eight-hour schedule." (See Ex. 6, Kailan Dep. at 96.)

[22] Robinson alleges (1) "at the time of his promotion, [he] was informed that he would receive a raise to $18.00/hr for his first two months as a machine operator, while he was in training, and that upon completion of his training, [his] wages would increase to $19.75/hr," (2) "upon

**D.    In March/April 2022, DHP Implements Reduction in Bag Machine Operator Hours.**

DHP subsequently reduced Bag Machine Operator hours in three waves.[23]  (See Ex. 1, Korzenko Aff. ¶ 15.)  The first wave was implemented on March 7, 2022.  (See id. ¶ 17; Ex. 10, 3/7/22 Payroll Change Notices.)  At that time, five Bag Machine Operators (none of whom were African-American/black) had their hours reduced from twelve to eight.  (See Ex. 1, Korzenko Aff. ¶ 17; Ex. 10, 3/7/22 Payroll Change Notices.)[24]  The second wave was implemented on March 14, 2022.  (See Ex. 1, Korzenko Aff. ¶ 19; Ex. 12, 3/14/22 Payroll Change Notices.)  This wave included Cagle and four other Bag Machine Operators (none of whom were African-American/black).  (See Ex. 1, Korzenko Aff. ¶ 19; Ex. 12, 3/14/22 Payroll Change Notices.)  The third wave was implemented on April 11, 2022.  (See Ex. 1, Korzenko Aff. ¶ 20; Ex. 13, 4/11/22 Payroll Change Notices.)  This wave included Robinson and one other Bag Machine Operator (who was not African-American/black).  (See Ex. 1, Korzenko Aff. ¶ 20; Ex. 13, 4/11/22 Payroll

---

completion of his training, [his w]ages were never increased," and (3) "[u]pon information and belief, Respondent's other machine operator employees who were not black/African-American were paid at the higher rate of $19.75/hr."  (See Doc. No. 48, Am. Compl. ¶ 22; see also Ex. 3, Robinson Dep. at 63-65 & 74-75.)  Robinson bases this last claim on hearsay and the fact that, on one occasion, he saw four coworkers' checks (including Cagle's) and they were higher than his. (See Ex. 3, Robinson Dep. at 77-83.)  He does not know their hourly rates, nor how many hours they worked, nor at what seniority/experience level they were.  (See id.)  And he has no admissible evidence to dispute the fact that (1) DHP bases Bag Machine Operators' pay rate on seniority/experience and performance, (2) Robinson's pay was commensurate with his seniority/experience level and performance, and (3) DHP paid other Bag Machine Operators who were not African-American/black at the same level as him.  (See Ex. 1, Korzenko Aff. ¶ 14; see also infra § I.H.)

[23] Prior to this first wave, DHP hired or promoted two individuals as Bag Machine Operators (neither of whom were African-American/black), all to eight-hour shifts.  (See Ex. 1, Korzenko Aff. ¶ 16; Ex. 9, 2/28/22 & 3/2/22 Payroll Change Notices.)

[24] This same date, DHP hired a Bag Machine Operator (not African-American/Black) to an eight-hour shift.  (See Ex. 1, Korzenko Aff. ¶ 18; Ex. 11, 3/7/22 Payroll Change Notice (New Hire).)

Change Notices.)[25]

> **E.** **Robinson and Kalpesh Have Altercation in April 2022 over Robinson's Machine Breaking Down.**

In April 2022, an altercation occurred between Robinson and Kalpesh.  (See Doc. No. 48, Am. Compl. ¶ 34.)  According to Robinson, his machine stopped working three or four times during the shift and, each time, Adjuster Kalpesh came over and fixed it.  (See Ex. 3, Robinson Dep. at 156.)  The last time Robinson's machine stopped working, Kalpesh yelled at him and told him to pay attention.  (See id. at 156-59.)  Robinson yelled back, saying he did not understand the problem and "don't know what the fuck I'm looking at," after which Kalpesh called him stupid and poked him in the chest with his finger.  (See id.)  At that point, Robinson yelled at Kalpesh that he would "punch him in his face if he touched [him] again."  (See id.)[26]

Kailan heard the commotion and went over.  (See Ex. 6, Kailan Dep. at 107-08.)  He instructed them to lower their voices, separated them, and then had conversations with each.  (See id. at 108-12.)  According to Robinson, Kailan told him to "relax, we'll figure it out, and then he told me I could go home for the day."[27]  (See Ex. 3, Robinson Dep. at 162.)  After that, Robinson

---

[25] Plaintiffs dispute DHP reduced some (but not all) of these employees' hours (based simply on the fact that, at times, such employees were there before Plaintiffs arrived at work), but admit they have no knowledge concerning the rest.  (See Ex. 2, Cagle Dep. at 128-34; Ex. 3, Robinson Dep. at 145-55.)  Accordingly, their claim that DHP reduced only their hours (see Doc. No. 48, Am. Compl. ¶ 32) is unsupported, as is their claim that the reduction had anything to do with their race (see, e.g., Ex. 3, Robinson Dep. at 155 (admitting only an assumption on his part)).

[26] While Cagle did not see what started the altercation, when he looked over, he saw Robinson and Kalpesh "were, like, inches away from each other's face, both speaking in very hostile tones, very adamant."  (See Ex. 2, Cagle Dep. at 138-39.)  According to Cagle, Kalpesh poked a finger at Robinson's chest and called him stupid and Robinson, in turn, told him he would "fuck him up" and/or "beat the fuck out" him.  (See id. at 139 & 144.)  After the incident, Kalpesh went over and helped Cagle with his machine.  (See id. at 142.)

[27] As Kailan testified:

I asked him why they were yelling at each other and he said that [Kalpesh] made up a – or fabricated a story he told him he was supposed to check on the machine

- 12 -

left.  (See id.)  Kailan also addressed the matter with Kalpesh:

> I spoke to [Kalpesh] and explained to him that his actions were not – not appropriate.  At the time we did not have a shift supervisor so he was the shift lead and I explained to him that my expectation is that there will be no yelling or screaming on the production floor and if there – if – if there's an issue with an employee that needs to be addressed, it needs to be addressed with HR or with a manager behind closed doors but at no point in time do I expect anyone to be yelled at or screamed at.

(See Ex. 6, Kailan Dep. at 112.)  He also asked Kalpesh to apologize.  (See id. at 112-13.)

### F.   The Next Day, a Coworker Tells Robinson to Stop Acting Like an "Angry Black Man."

Bolognese met with Robinson (and, according to the Complaint, Cagle) the next day about the altercation between Robinson and Kalpesh.  (See Doc. No. 48, Am. Compl. ¶ 36; Ex. 3, Robinson Dep. at 162-63.)  As Robinson recounted:

> Told to pretty much relax, try and remember that the language [barrier] could be an issue causing people to be short-tempered or to, you know, blow up, that it's not personal, it's not personal.  I asked them why was I the only one sent home, and I got no answer to that, and that's pretty much like how the conversation went. . . .
>
> He also noted to me that if a situation like that happens, that, you know, it's okay for me to take ten minutes and I could shut down my machine, take ten minutes and then come back to the machine and figure it out.

(See Ex. 3, Robinson Dep. at 163-64.)  According to Plaintiffs, an Indian coworker, "J," overheard their discussion with Bolognese and referred to Robinson as an "angry black man."[28]  (See Doc.

---

and [Kalpesh] never told him that and subsequently the machine had went – went down, and when [Kalpesh] came back and saw that the machine was down, he started yelling at Mr. Robinson stating that, I told you to check the machine, you did not check it, that's why the machine is down, and Mr. Robinson said that he was not – he didn't appreciate the way that [Kalpesh] was speaking to him and he did not believe that [Kalpesh] told him that, and so he responded in turn by raising his voice to [Kalpesh] and telling him that, You didn't tell me that.

(See Ex. 6, Kailan Dep. at 109.)

[28] DHP does not know to whom Plaintiffs refer and Plaintiffs do not know his first or last name.

No. 48, Am. Compl. ¶ 37.)  More specifically, according to Robinson:

> ["J"] said you work good, something along the lines like you work good, but you need to relax, you need to stop being mad, can't be angry black man, or he said you're any angry black man, you need to relax, calm down, something along those lines.  Not word for word, but that's what was said. . . .

> Something along the lines you need to calm down, stop being such an angry black man.

(See Ex. 3, Robinson Dep. at 165-66.)

Plaintiffs claim that, following this incident, other Indian coworkers referred to them as "angry black men."  (See Doc. No. 48, Am. Compl. ¶ 38; see also Ex. 3, Robinson Dep. at 130-31.)  At his deposition, Cagle identified seven Indian coworkers ("J," Narendra, Jaymatti, Sejal, Mahesh, Noel, and Divyesh) he claims referred to him as an "angry black man," most of which he cannot place date-wise (and none specifically within the applicable limitations period).  (See Ex. 2, Cagle Dep. at 145-55; see also Doc. No. 48, Am. Compl. ¶ 39.)  Robinson identified three Indian coworkers ("J," Sejal, and Jaymatti) he claims referred to him as an "angry black man," most of which he similarly cannot place date-wise (and none specifically within the applicable limitations period).  (See Ex. 3, Robinson Dep. at 106-08, 124-25, 131, & 166-67.)[29]

### G.    In Early July 2022, Robinson receives Final Warning for Attendance Issues.

On February 1, 2022, DHP implemented an Attendance Policy based on a points system.  (See Ex. 1, Korzenko Aff. ¶ 21; Ex. 2, Cagle Dep. at 85; Ex. 14, 2/1/22 Attendance Policy.)  Pursuant to this policy, employees received ½ a point for tardiness, ½ a point for early departures,

---

[29] Robinson also testified, at some point, he overheard a Hispanic coworker, Laura, use the phrase "marrano" (which means "pig" or "dirty person") and "cocolo," which refers to Afro-Caribbean migrant descendants.  (See Ex. 3, Robinson Dep. at 114-16.)  He testified: "I'm not exactly [sure] how it translates from Spanish to English because my Spanish is bad, but I know what this mother-fucker or this Marrano sounds like in Spanish, and I know when somebody is talking shit in Spanish because it's very easy to understand."  (See id. at 115.)

1 point for unexcused absences, and 3 points for no-call/no-shows. (See Ex. 14, 2/1/22 Attendance Policy.) Under this Attendance Policy, if an employee incurs 3 points, s/he receives a documented verbal warning. (See id.) If an employee incurs 6 points, s/he receives a written warning. (See id.) If an employee incurs 9 points, s/he receives a final written warning and counseling (and potentially suspension without pay). (See id.) If an employee incurs more than 9 points, s/he is subject to termination. (See id.) In light of the fact that this was a new policy, DHP did not rigidly enforce it at first, to allow employees time to adjust. (See Ex. 1, Korzenko Aff. ¶ 21.)

By early July 2022, however, Robinson had incurred 17.5 attendance points.[30] (See Ex. 1, Korzenko Aff. ¶ 22; Ex. 15, 7/5/22 Final Warning.) While, per policy, DHP could have terminated his employment then and there, Bolognese issued him a Final Warning (through which he excused 7 points):

> You have accumulated ~~17.5~~ 10.5 attendance points due to ~~13~~ 9 unexcused absences (~~13~~ 9 points), 2 late (1 points), 1 left early (0.5 points) ~~and 1 no-call no-show (3 points)~~. The Attendance policy states that after 9 points you receive a final warning and 10 points is termination. This is your final warning. Improvement is needed immediately to avoid further disciplinary action.

(See Ex. 1, Korzenko Aff. ¶ 22; Ex. 15, 7/5/22 Final Warning; see also Ex. 3, Robinson Dep. at 167-74.)[31] While the Final Warning invited Robinson, should he disagree with any information contained in the document, to submit a written statement explaining his position, Robinson submitted no such statement (he claims he was told it was not necessary) and simply signed the Final Warning. (See Ex. 15, 7/5/22 Final Warning; see also Ex. 3 Robinson Dep. at 168-74.)

---

[30] Robinson does not dispute he was absent on the days in question but thinks some of them should have been excused. (See Ex. 3, Robinson Dep. at 169-73.)

[31] Robinson claims he was not previously aware of the new policy. (See Ex. 3, Robinson Dep. at 174.) He admits, however, DHP showed him the policy when delivering the Final Warning. (See id.)

### H.    **In Early July 2022, Robinson Complains About His Pay Again.**

In July 2022, Robinson complained again about his pay.  (See Ex. 3, Robinson Dep. at 75-

76 & 83-89.)  While Robinson does not recall complaining that Cagle was paid more than him (see

id. at 83), Kailan's and Korzenko's subsequent investigation into that issue revealed that was true,

based on an error that resulted in Cagle receiving more than he was supposed to—an error DHP

never corrected (to Cagle's benefit).  (See Ex 1, Korzenko Aff. ¶ 23; Ex. 16, 7/8/22 Email from R.

Kailan.)  Based on that investigation, Kailan and Korzenko concluded:

> [Robinson's] rate is properly aligned with his experience level of basic operations
> of M10.  In order for [Robinson] to move to the next level, he would need to
> demonstrate advanced operation of the machine, which includes basic adjustment
> and corrections with limited over-sight, minor size changes, re-webbing, etc.
> Essentially, he would only need to call an adjuster for serious mechanical or
> electrical issues.

(See Ex. 16, 7/8/22 Email from R. Kailan.)  Signore shared Kailan's July 8, 2022 email with

Robinson.  (See id. Ex. 3, Robinson Dep. at 88-89.)

### I.    **In Late July 2022, Plaintiffs Walk Out of Mandatory Safety Meeting.**

On July 21, 2022, DHP held a mandatory safety meeting for its Bag Machine Operators on

third shift.  (See Doc. No. 48, Am. Compl. ¶¶ 46-48; Ex. 1, Korzenko Aff. ¶ 24; Ex. 3, Cagle Dep.

at 72.)  DHP Safety Coordinator Ahmad Namazi Fard ("Fard") led the meeting.  (See Doc. No.

28, Am. Compl. ¶ 46; Ex. 1, Korzenko Aff. ¶ 24.)  The meeting included a safety video and a quiz.

(See Doc. No. 48, Am. Compl. ¶ 46.)  At the meeting, Cagle challenged Fard about something he

said about a fire extinguisher and he and Robinson stormed out of the meeting:

> So during that safety meeting we were learning about fire extinguisher safety and
> procedure.  The safety coordinator, Ahmad, was playing a video but telling us what
> they wanted as an answer on the paper.  One of the things he said I highly disagreed
> with.  I said that's not even what the video said to do.  The statement was if a small
> fire breaks in front of you, what are you supposed to do.  The video said
> immediately grab a small fire extinguisher in your vicinity, and if that does not
> work evacuate the building.  Ahmad wanted us to put go find a big fire extinguisher,
> if that doesn't work to evacuate the building.  I said that's not what the video said.

- 16 -

He said that is true, but that is not answer we require. I said I'm not putting an opposite answer from the instructional video as to what you want. He said that is what I'm requiring of you, and there's a second video, I got up and walked out, told Mr. Robinson I'm leaving, you can stay if you choose to, but I'm not participating in this.

(See Ex. 2, Cagle Dep. at 181-82; Ex. 3, Robinson Dep. at 175-76.) After Cagle and Robinson walked out of the meeting, they saw Bolognese and Signore on the floor and went to tell them what happened:

As we walked out I saw [Bolognese] and [Signore] on the floor. I walked up to them immediately and told them this is what happened, and is why I left, is there a problem. [Bolognese] was like, it is a mandatory safety meeting. I said I finished the paper but I walked out before I knew there was a second one, is that a problem. He said you're going to have to make it up on a later date. I said fine, I'm going home. He said okay.

(See Ex. 2, Cagle Dep. at 182.)[32] Cagle went out on vacation the following week. (See Doc. No. 48, Am. Compl. ¶ 49; Ex. 2, Cagle Dep. at 186, 188, & 192-96.)

On Monday, July 25, 2025, Korzenko and Kailan spoke with Cagle by phone. (See Doc. No. 48, Am. Compl. ¶ 49.) Cagle texted Robinson:

Just got off the phone with HR and [Korzenko] and they tried to suspend me on vacation said it was going to be unpaid and I started going off so call me back because basically they're trying to say I was walking out on the little safety dude was us walking out on the superior and I said he's not a superior and he was like oh even if it's a coworker you have to stay there and listen no I don't so then I went off like bro you said he was gonna do shit about all the shit is going wrong and only thing you're focusing on is PPE and me and my cousin[33] so what are we doing like we will call you back.

(See Ex. 3, Cagle Dep. at 188-89; Ex. 8, Text Messages at P75.) That week, Kailan and Signore

---

[32] Plaintiffs allege a white coworker, Scott Graham ("Graham"), also left the safety meeting early. (See Doc. No. 48, Am. Compl. ¶ 47; Ex. 2, Cagle Dep. at 184; Ex. 3, Robinson Dep. at 176-77.) Graham, however, had prior approval to leave the meeting early (and did not challenge the Safety Coordinator and then storm out like Plaintiffs did). (See Ex. 1, Korzenko Aff. ¶ 24.)

[33] Cagle and Robinson referred to each other as cousins. (See Ex. 2, Cagle Dep. at 9.)

met with Robinson.  (<u>See</u> Ex. 3, Robinson Dep. at 179-85.)  Kailan opened the meeting noting "safety meetings are mandatory" and telling Robinson, "you know better than that."  (<u>See</u> <u>id.</u> at 180-82.)  Robinson testified he believed Kailan (his supervisor's boss' boss) was condescending and had an "attitude," to which Robinson responded in kind:

> Q.    And did you have an attitude during this meeting?
>
> A.    Not until I was addressed as such.  I'm nobody's child, so when he addressed me as such, I instantly disregarded what he said.

(<u>See</u> <u>id.</u> at 181.)  Towards the end of the meeting, Robinson began interrupting Kailan because Kailan was "[e]xplaining how to do things, you know we do things like this for a reason and it has to be this way and we can't have this . . . ."  (<u>See</u> <u>id.</u> at 182-83.)  Robinson did not like the tone of Kailan's voice and threatened to walk out of the meeting.  (<u>See</u> <u>id.</u> at 183-84.)  Kailan warned Robinson if he walked out of the meeting his employment would be terminated.  (<u>See</u> <u>id.</u>)  Robinson testified he asked Kailan about "racial tension" and people staring and sabotaging his machine and Kailan laughed and said this was the first time he was hearing about any of that, and asked "what do you want me to do about it?"  (<u>See</u> <u>id.</u> at 184-85.)[34]

Notwithstanding any and all of the foregoing, neither Cagle nor Robinson received any discipline as a result of their walking out of the July 21 safety meeting.  (<u>See</u> Ex. 1, Korzenko Aff. ¶ 24; Ex. 2, Cagle Dep. at 191.)

## J.    On August 3, 2022, DHP Terminates Robinson's Employment for Deficient Attendance.

Unfortunately, Robinson did not heed the Final Warning he received in early July 2022 for attendance.  Robinson was absent from work on July 25 and 26 and August 1 and 2. (<u>See</u> Ex. 1,

---

[34] While Plaintiffs' Amended Complaint says this meeting occurred between Kailan, Signore, and <u>Cagle</u> (<u>see</u> Doc. No. 48, Am. Compl. ¶ 50), Robinson testified it was him at the meeting, not Cagle (and, as noted above, Cagle was out on vacation that week).

Korzenko Aff. ¶¶ 25-26; Ex. 3, Robinson Dep. at 185-86; Ex. 17, Attendance Record.)  While Robinson does not specifically recall why he was absent those days, he believes they may have been "related either to my health or my stepmother's health." (See Ex. 3, Robinson Dep. at 186.) Based on its understanding that Robinson did not properly request these days off, DHP treated these absences as unexcused and, accordingly, terminated his employment pursuant to its Attendance Policy.[35]  (See Doc. No. 48, Am. Compl. ¶ 41; Ex. 1, Korzenko Aff. ¶ 26; Ex. 3, Robinson Dep. at 185-87.)

### K.   Shortly After Robinson's Termination, Plaintiffs Complain to Novolex HR.

On August 5, 2022, Plaintiffs contacted Novolex's Human Resources department.  (See Doc. No. 48, Am. Compl. ¶ 51; Ex. 2, Cagle Dep. at 196.)  Director of Compensation & HR Services Sharon Bowen received their complaints.  (See Ex. 2, Cagle Dep. at 196; Ex. 1, Korzenko Aff. ¶ 28; Ex. 18, 8/5/22 Email from S. Bowen.)  As to Robinson, her notes reflect:

- Says he is being retaliated against for voicing complaints, unsafe acts are being brushed under the ru[g.][36]
- Someone made a complaint against [him] which resulted in a meeting with

---

[35] Since 2021, DHP has terminated sixty-four employees (almost seventy percent of whom were not African-American/black) for attendance issues.  (See Ex. 1, Korzenko Aff. ¶ 27.)

[36] When asked at his deposition what he meant by "unsafe acts," Robinson testified that he complained about a "leaky roof," excess garbage at his machine, and the fact that coworkers had (as tools of the trade) razor blades.  (See Ex. 3, Robinson Dep. at 141-42 & 188.)  Relatedly, in September 2022, Cagle told Robinson he was going to start carrying a "shank" at work:

> yo I think I'm going to start carrying a shank in here with me just because it's been a year that we made the complaints about being stared at being made to feel uncomfortable me and you have both been the [sic] level four or five prison yards and I've never been this uncomfortable a day in my life after them repeatedly not adhering to the grievances at hand I think I should start carrying a second form of protection due to the fact that you've seen it for yourself a lot of them have a legal long bleed [sic] stashed around the facility and now that I'm really the only black man on the shift I'm always uncomfortable this is absurd and ridiculous.

(See Ex. 8, Text Messages at P78.)

[Bolognese]; became argumentative; was told if he didn't go back to work, he would be fired.

- Says day or two later he was fired for doing what he was told to do
- Reason for separation- attendance; says he takes care of his step-mother and on occasion has to take [her] to hospital and pick-up. He said he was told to let them know and the company would work with him. I think he said Monday he had car trouble; Tuesday had to take step-mom to hospital. He says he called in like he was supposed to leave a message if he was supposed to come in and didn't receive a call back.
- [He] says [Korzenko] informed him Wednesday this week he was termed.
- Says other employees call out with no issues
- Says there is racial tension at the plant, and he is being targeted
- Says members of management laugh at the complaints being made
- Both [Robinson] and [Cagle] work the same shift with same supervisor.

(See Ex. 18, 8/5/22 Email from S. Bowen.) As to Cagle, Bowen's notes reflect:

- Says he was called by [Bolognese] / [Korzenko] while he was on vacation informing him, he was being suspended. I think this is related to [Cagle] walking out of the safety meeting. Said he had a meeting with [Signore] and [Bolognese] and was told he would have to make-up the safety training. [Cagle] says he didn't agree with the safety instructor on what to do if there is a fire in the plant; said the teacher was not correct about where to get a fire extinguisher in the event of a fire.
- Says no [one] yet has contacted him about making up the safety meeting.

(See id.; Ex. 2, Cagle Dep. at 196-97.)[37]

Bowen referred the matter to Director of Human Resources Amber Washnock for investigation. (See Ex. 1, Korzenko Aff. ¶¶ 28-29; Ex. 18, 8/5/22 Email from S. Bowen.) Washnock conducted an investigation, including interviews with Cagle, Robinson, Kailan, and Korzenko, and reviewing information from Bolognese and Signore. (See Ex. 1, Korzenko Aff. ¶ 29; Ex. 19, Washnock Investigation Notes.) She ultimately concluded Cagle's and Robinson's complaints were unsubstantiated and suggested further communications with Cagle to work on his

---

[37] In addition to the foregoing, Cagle testified he told Bowen he had "repeatedly reported a hostile work environment, the ostracism, what we believed to be racism and racist tactics, and the overall ignorance of said grievance that we've repeated multiple times to management and followed the chain of command which led us to calling her." (See Ex. 2, Cagle Dep. at 197-98.)

issues.  (See id.)

**L.    In Late August 2022, Cagle refers to Disabled Coworker as "Nigga".**

One of Plaintiffs' coworkers, Noel, does not have a hand and, accordingly, uses a prosthetic.  (See Ex. 2, Cagle Dep. at 208.)  On August 25, 2022, Noel removed his prosthetic and cleaned the part of his arm that connects to it.  (See id.)  After observing him do so, Cagle texted Robinson: "Fucking 😱 😂 😂 😂 💀 just seen this nigga scrub his nub 🤮 😂"[38]  (See Ex. 8, Text Messages at 106.)

**M.    In October 2022, a First Shift Coworker Claims Cagle Did Not Clean His Machine; Kalpesh Defends Cagle; Cagle Complains about Signore.**

In or about October 2022, an Indian Bag Machine Operator on first shift told management that Cagle did not clean his machine.  (See Doc. No. 48, Am. Compl. ¶ 52.)  Bolognese and Kalpesh spoke with Cagle about it:

> [Bolognese] asked me do I clean my machine.  I said yes, I clean it daily.  I clean it as soon as I get here, and I clean it 30 minutes before I leave.  Kalpesh backed up my statement and says that is true because I'm with him when he cleans the machine to make sure it's done properly.

(See Ex. 2, Cagle Dep. at 218-19.)  Bolognese told Cagle he would look into the matter but did not circle back with him.  (See id. at 219-20.)  Cagle received no discipline.  (See id. at 219.)  Nonetheless, Cagle left a note for his peers on first shift, which said:

> To whoever is reporting that third shift is not properly cleaning the machine, please present pictures with your claim because I have pictures and videos daily of me cleaning my machine.  I also have pictures and videos of me coming in to often a machine that is unclean.  Thank you.  Third shift operator Cagle.

(See id. at 220; Ex. 1, Korzenko Aff. ¶ 30.)  Signore asked Cagle why he left the note.  (See Ex. 2, Cagle Dep. at 222.)  Cagle explained why and "asked Signore what he was going to do to address

---

[38] DHP was not aware of this comment until discovery in this lawsuit, but it bears on the subjective prong of Plaintiffs' race-based hostile work environment claim.

the fact that a false accusation had been made against him," to which Signore responded, in sum and substance, "Why does it fucking matter?"  (See Doc. No. 48, Am. Compl. ¶ 52.)

On October 27, 2022, Cagle emailed Bolognese to request a meeting:

Hello and good morning Rich if at all possible I would like to schedule a meeting with you [Kailan] and [Korzenko] sometime next week not only about my attendance [see infra § I.N] and my confusion on it but also some other issues that have still not been addressed by my supervisor or by his supervisors if you could let me know what day works best for the three of you so we can all coordinate I would very much appreciate it thank you and have a nice rest of your day.

(See Doc. No. 48, Am. Compl. ¶ 53; Ex. 2, Cagle Dep. at 222-23; Ex. 20, 10/27/22 Email from T. Cagle.)  Cagle subsequently was out with COVID-19 so the meeting did not immediately occur. (See Ex. 2, Cagle Dep. at 223-24.)  Cagle followed up in early November.  (See Ex. 21, 11/2/22 Email from T. Cagle.)  Bolognese and Signore ultimately met with Cagle on December 1.  (See Ex. 22, 12/1/22 Email from T. Cagle.)

**N.  On November 15, 2022, Cagle Receives Final Warning for Excessive Absenteeism.**

By mid-November 2022, Cagle had accumulated 10.5 attendance points.  (See Ex. 1, Korzenko Aff. ¶ 31; Ex. 2, Cagle Dep. at 228-30.)  Accordingly, Cagle received a Final Warning for excessive absenteeism.  (See Ex. 1, Korzenko Aff. ¶ 31; Ex. 2, Cagle Dep. at 228-30; Ex. 23, 11/15/22 Final Warning.)  Cagle does not dispute that he had accumulated those attendance points and admits (1) per policy, his employment could have been terminated at that point, and (2) DHP nonetheless did not do so.  (See Ex. 2, Cagle Dep. at 239.)

**O.  On December 6, 2022, Cagle Storms Out of Meeting with Management; As Result, He Receives Final Warning for Insubordination.**

In late November 2022, Cagle missed a safety meeting that occurred on his shift.  (See Doc. No. 48, Am. Compl. ¶ 55.)  When he asked to make it up, Bolognese told him there was no make-up day and he would have to attend when it was presented to another shift.  (See id.)

- 22 -

On December 1, 2022, Cagle emailed Korzenko asking for a print-out of all of his work-related tasks as a Bag Machine Operator[39] and to address his absence from a safety meeting:

> Hello and good morning I am emailing you to ask specifically for a print out of all my work related tasks as a machine operator.  I would like that tonight if at all possible if it is please leave it with [Signore] Also I had a meeting with [Bolognese] and [Signore] about my absence from a safety meeting that I had asked for a make up day was told by [Bolognese] there wasn't one I had to pick a shift and attend at those times.
>
> I responded with if they want mi to be by the book I expect my coworkers to be treated in the same manor because the way actions are taken when it comes to me and the focus of what I am not doing seams [sic] to handlers [sic] expediently but my request for better training, making my coworkers engage with me more who are familiar with the job, but seem to only want to converse in her own dialect in front of me and supervisors is starting to make me feel like I'm being targeted, like I had mentioned, when Mr. Robinson was still employed with this company if I continue to feel like I am being targeted after this email today, I will be contacting [two attorneys who assisted him in various criminal matters] to speak on my behalf. Thank you and enjoy your evening.

(See Ex. 2, Cagle Dep. at 231-35; Ex. 24, 12/1/22 7:00 a.m. Email from T. Cagle.)  That same evening, Cagle sent Korzenko another email:

> Confusion by management and what I have requested I have a requested a shift change three times and have been denied three times by receiving no response from [Signore] or [Bolognese] as I have watched several other employees asked for a shift change at the same time as me two of them after and were granted the shift change to first shift both employees.[40]  Both employees were machine operators after I was told there was no room on the first shift when I initially requested my shift changed due to school. [Signore] and [Bolognese] ignored me. I've asked for a shift change again to be moved to second shift.  [Signore] got back to me and said that he doubts they would accommodate me.  I asked for a shift change a third time only offering to be moved by an hour Instead of 10 to 639 to 530 and again [Signore] said he doubted instead of actually doing his job as my superior and relating my request to the proper chain of command seeing as how it starts with him.  I've asked for specific training on things I am not currently up to par with on

[39] According to Cagle, during their meeting, Signore said he "wasn't fulfilling all my duties as a machine operator" so he demanded a print-out of all duties from Korzenko.  (See Ex. 2, Cagle Dep. at 239.)

[40] Shortly thereafter, Cagle texted Robinson, complaining management was "[c]onsistently saying there's no shift openings but I keep seeing them swap out Mexicans like they're fucking shebangs at the fucking commissary."  (See Ex. 8, Text Messages at P117.)

my machine such as. Being shown how to measure the role accurately and pads, I met with facetious remarks by [Signore] saying I've been there long enough that I should be able to know what I am going what I do know what I am doing. I'm asking for more guidance on what I am doing that way I can do it quicker I need to go to K[a]lpesh my shift lead for less assistance. This is just a brief list on things I have requested and have been ignored on whereas the list of complaints from fellow employees, my supervisor and his superior seem to never end. If we look at the recent inquiry into my great grandmother's obituary where I missed a day in September versus where I called out in October and a complaint was made about me and nothing was done to rectify. This complaint seems I was not there the list does continue. I don't feel like need it that far with just those examples for you you yourself have heard me make some of these requests to my superiors do too, but why am I the only one ever taking action I need to points, and my coworkers and superiors are allowed to continue with their behavior and demeanor is starting to become just more nuisance, and seems to be the narrative we want to focus on.

(See Ex. 2, Cagle Dep. at 236-237; Ex. 25, 12/1/22 7:16 a.m. Email from T. Cagle.)

The next morning, on December 2, 2022, Cagle emailed Korzenko asking for a meeting with Kailan and her:

Hello and good morning I would first like to apologize for the second email I sent you yesterday morning. It was very long and run-on sentence [sic] is because I was walking along the highway and could not stop to properly punctuated [sic] space so I would like the [sic] first off apologize for that.

Secondly, I would like to request a meeting with [Signore's] and [Bolognese's] immediate supervisor. I believe that is the plant manager. The reason I am requesting this is because I no longer feel that dealing with [Signore] and [Bolognese] directly with any of my grievances and problems or even misunderstandings is no longer an option seeing as how after 16 months, I am still dealing with the same issues. I have reported to you directly and to the both of them directly as individuals and as a group. I'm still being ignored, dismissed, even when it is something small as asking my immediate supervisor for a printout of my day-to-day task. That is expected of me while I am on shift and he chose to leave without presenting me that information. So if you could help me in anyway, set up a in person meeting with you and the plant manager, I would greatly appreciate it. Again I apologize for yesterday and you have nice day.

(See Ex. 2, Cagle Dep. at 238-40; Ex. 26, 12/2/22 Email from T. Cagle.)[41]

Korzenko granted Cagle's request and ultimately scheduled the meeting for December 6,

---

[41] Noticeably absent from these emails is any reference to race/color.

- 24 -

2022.  (See Doc. No. 48, Am. Compl. ¶¶ 59-61; Ex. 1, Korzenko Aff. ¶ 32; Ex. 2, Cagle Dep. at

240.)  She invited Bolognese and Signore as well, notwithstanding that Cagle had asked they not

attend, as Korzenko and Kailan agreed it made sense to include them so they all could work

through Cagle's issues.  (See Ex. 1, Korzenko Aff. ¶ 32; Ex. 6, Kailan Dep. at 163-64.)[42]  At his

deposition, Cagle described the meeting as follows:

> I was basically given a printout of like maybe 80 tasks, and I asked was that all of
> them, they said no, we're not going to be able to print out all of your tasks, some of
> those are just factory requirements, which we never really got a chance to get into
> because I immediately skipped into okay, well, I'll read this later.  What are we
> doing about my training?  I've been complaining about the same thing for months.
> What are we going to do about this hostile environment and the racial tension in
> here?  And I was told, like, it's a work in progress, and I immediately cut them off
> saying I'm tired of [sic] answer.  This is textbook blanketing.  You guys have been
> giving me this answer for over a year now, I've been here for over a year.  I
> understand things take time, but in a year's time nothing has changed.

(See Ex. 2, Cagle Dep. at 241-42; see also id. at 22-24.)  According to Cagle, Korzenko told him

"in a very high octave" that he "needed to stop and listen."  (See id. at 243.)  After that, Cagle

"zoned out," "immediately stopped listening," and got up to leave.  (See id. at 242-43.)  Korzenko

asked him to sit back down but "by then [he] was already at the door stating that [he] was leaving."

(See id. at 243.)  Cagle responded, "it is what it is.  I respond to hostility with hostility.  We've

been down this road before, and I'm leaving."  (See id.)  At that point, Kailan warned Cagle that,

if he left, it would be considered insubordination and his employment would be suspended.  (See

id. at 24 & 243-44.)  Notwithstanding Kailan's warning, Cagle walked out of the meeting.  (See

id.)  As a result, Cagle was given a Final Warning for insubordination and suspended without pay

from December 6 to 12, 2022.  (See Doc. No. 48, Am. Compl. ¶ 62; Ex. 1, Korzenko Aff. ¶ 33;

---

[42] Contrary to Cagle's suggestion (see Doc. No. 48, Am. Compl. ¶¶ 57-58), the fact that
Kailan and Korzenko invited Bolognese and Signore to the meeting to work through Cagle's issues
plainly did not somehow violate DHP's Open Door Policy.

Ex. 2, Cagle Dep. at 244-45; Ex. 27, 12/13/22 Final Warning.)[43]

      **P.**      **In May 2023, Korzenko Engages in Interactive Dialogue with Cagle on Need for Prescription PPE Eyeglasses.**

In mid-May 2023, Cagle spoke with Korzenko about a need for prescription eyewear.[44] (See Ex. 1, Korzenko Aff. ¶ 35; Ex. 2, Cagle Dep. at 35.)  As a result of their discussion, Korzenko completed an ADAAA: Intake Discussion form for Cagle.  (See Ex. 1, Korzenko Aff. ¶ 36; Ex. 28, ADAAA: Intake Discussion Form.)  The form notes Cagle (1) disclosed he is legally blind and cannot see objects far away or close up, (2) has the Adjuster verbally explain adjustments and corrections, and (3) received DHP's prescription safety eyeglass instructions but needs a vision prescription from an eye doctor.  (See Ex. 28, ADAAA: Intake Discussion Form.)  Cagle never followed up on any need for prescription safety eyeglasses.  (See Ex. 1, Korzenko Aff. ¶ 37.)

**II.**      **RELEVANT PROCEDURAL BACKGROUND**

On May 5, 2023, Cagle filed a charge against DHP with the CHRO alleging discrimination on the basis of race/color (Black/African American), national origin (Jamaican), and disability (vision impairment) as well as retaliation in violation of CFEPA, Title VII of the Civil Rights Act ("Title VII"), and the Americans with Disabilities Act ("ADA").  (See Doc. No. 48, Am. Compl. ¶ 63; Ex. 2, Cagle Dep. at 13.)  On May 15, 2023, Robinson filed a similar charge with the CHRO against DHP alleging discrimination on the basis of race/color (Black/African American) and retaliation in violation of CFEPA and Title VII.  (See Doc. No. 48, Am. Compl. ¶ 65.)

---

[43] After he received this Final Warning, Cagle texted Robinson that "this company doesn't believe it written in [sic] first warnings you only get finals this is my third final," to which Robinson responded: "Tf [the fuck] m[u]st be some kind of special retarded."  (See Ex. 2, Cagle Dep. at 246-47, Ex. 8, Text Messages at P119.)

[44] If an employee needs prescription PPE glasses, s/he can complete a form and DHP will pay for them.  (See Ex. 1, Korzenko Aff. ¶ 34.)

On January 18, 2024, Cagle and Robinson initiated a joint action against DHP (incorrectly naming Novolex as defendant) in the New Haven Superior Court.  Both Plaintiffs claim race/color discrimination and retaliation.[45]  Cagle also claims disability discrimination.  DHP removed the case to this Court on February 6, 2024.  (See Doc. No. 1.)  Over a year later, on March 28, 2025, Plaintiffs filed an Amended Complaint.  (See Doc. No. 48.)  Because no genuine issues of material fact exist as to any of Plaintiffs' claims, DHP moves for summary judgment on all counts.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Benoit v. Sikorsky Aircraft, No. 3:20-cv-00717 (SVN), 2022 WL 3043240, at *4 (D. Conn. Aug. 2, 2022) (citing Fed. R. Civ. P. 56).  "A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  While the moving party bears the burden of showing no disputed facts exist, it can meet that burden "by pointing out an absence of evidence to support the non-moving party's case."  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); PepsiCo, Inc. v. Coca Cola Co., 315 F.3d 101, 105 (2d Cir. 2002)).  "If the moving party demonstrates there are no disputed issues of material fact, the burden shifts to the non-moving party to rebut this showing through introduction of 'specific evidence demonstrating the existence of a genuine dispute of material fact.'"  Id. (citing Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)).

"A party opposing summary judgment 'must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or

---

[45] Plaintiffs testified no material difference exists between their race and color discrimination claims.  (See Ex. 2, Cagle Dep. at 22; Ex. 3, Robinson Dep. at 20-21.)  Accordingly, DHP considers them together for purposes of this motion.

unsubstantiated speculation.'"  <u>Hale v. Hirschfeld</u>, No. 3:19-cv-1963 (OAW), 2022 WL 4448865, at *11 (D. Conn. Sept. 23, 2022) (citing <u>Robinson v. Concentra Health Servs.</u>, 781 F.3d 42, 44 (2d Cir. 2015)).   "Instead, the party opposing summary judgment must set forth in their response 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  <u>Id.</u> (citing <u>Anderson</u>, 477 U.S. at 243).  In other words, the party opposing summary judgment "must designate specific facts showing that there is a genuine issue for trial."  <u>Lockett v. Target Corp.</u>, No. 3:20-cv-00191 (SVN), 2022 WL 17127292, at *4 (D. Conn. Nov. 22, 2022) (citing <u>Parker v. Sony Pictures Ent., Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001)).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  <u>Hale</u>, 2022 WL 4448865, at *11 (citing <u>Brown</u>, 654 F.3d at 358).

## IV.   <u>LEGAL ARGUMENT</u>

### A.   **Plaintiffs' Race/Color Discrimination Claims (Counts One through Four).**

In Counts One through Four, Plaintiffs' claim DHP discriminated against them based on their race/color in violation of CFEPA.  When asked at his deposition who at DHP he claims discriminated against him based on his race, Cagle answered, "[a]ll of my fellow co-workers being of Hindu race and Mexican race" and, after rattling off a number of names, also identified Kailan, Bolognese, Signore, and "J" (whoever that is).  (<u>See</u> Ex. 2, Cagle Dep. at 16-20.)  Robinson similarly testified essentially all his coworkers and managers discriminated against him based on his race/color.  (<u>See</u> Ex. 3, Robinson Dep. at 16-18.)  Plaintiffs bring their race/color discrimination claims on both disparate treatment and hostile work environment theories.  (<u>See</u> Doc. No. 48, Am. Compl. ¶¶ 71-73, 77-79, 83-85, & 89-91.)

1.    **Plaintiffs' Disparate Treatment Race/Color Discrimination Claims Fail Because Neither Can Establish a *Prima Facie* Case.**

To prevail on their disparate treatment race/color discrimination claims, Plaintiffs first must establish a *prima facie* case by showing, among other things, the adverse employment actions at issue (*i.e.*, Robinson's August 2022 termination and Cagle's December 2022 one-week suspension) occurred under circumstances giving rise to an inference of race/color discrimination. See Chima v. KX Techs., LLC, No. 3:21-cv-00801 (JCH), 2022 WL 13682064, at *5 (D. Conn. Oct. 21, 2022) (citing Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 74-75 (2d Cir. 2016)).  While Plaintiffs' burden at this stage is *de minimis* and requires only that they proffer admissible evidence showing circumstances that would permit a rational factfinder to infer a discriminatory motive, the fact remains that, "even in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  See Benoit v. Sikorsky Aircraft, No. 3:20-CV-00717 (SVN), 2022 WL 3043240, at *5 (D. Conn. Aug. 2, 2022) (citing Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995); Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)).  Plaintiffs cannot satisfy their burden here.

As a preliminary (and, candidly, dispositive) matter, neither Cagle nor Robinson believe DHP based either adverse action on their race/color.  Indeed, when asked at his deposition whether he believes DHP suspended his employment based on his race, Cagle testified, "A little." (See Ex. 2, Cagle Dep. at 251.)  When asked what he meant by that, Cagle mentioned only the fact that he "brought up racial tension and hostility and was told to stop." (See id. at 252.)  And when asked whether DHP suspended his employment based on his color, Cagle answered in the negative:

Q.    Do you claim that the decision to suspend your employment in December 2022 was based on your color?

A.    No.

(See id. at 255.)  Similarly, when asked at his deposition whether he believes DHP terminated his

employment based on his race, Robinson also answered negatively:

> Q.    Well, do you claim it, do you claim that the company terminated your
>       employment based on your race?
>
> A.    No, I believe more so for retaliation.

(See Ex. 3, Robinson Dep. at 206.)  Where neither Cagle nor Robinson believe DHP took the

adverse actions at issue based on their race/color, they will be hard-pressed to ask a jury to

conclude otherwise.  And beyond these fatal admissions, no admissible evidence exists to create

any inference of discriminatory motive.[46]

## 2.    Plaintiffs' Disparate Treatment Race/Color Discrimination Claims Also Fail Because They Cannot Show DHP's Reasons for the Adverse Actions at Issue Were False and Pretextual.

Assuming Plaintiffs could establish a *prima facie* case (as explained above, they plainly

cannot), to prevail on their disparate treatment race/color discrimination claims, Plaintiffs still

must "prove by preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination."  Almodovar v. Cross Fin. Corp.,

No. 3:20-cv-01179 (JCH), 2022 WL 1810132, at *6 (D. Conn. Jun. 2, 2022) (citing St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (other citation omitted).  "[A] reason cannot be

proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and

that discrimination was the real reason."  Id. (citing Hicks, 509 U.S. at 515) (other citation omitted).

Thus, to defeat summary judgment, Plaintiffs must point to evidence sufficient to permit a rational

trier of fact to conclude both that DHP's proffered reasons were false, and (2) discrimination was

the real reason.  See id. (citation omitted).  Plaintiffs can make neither showing.

---

[46] Similarly, to the extent Plaintiffs claim DHP reduced their hours in March/April 2022 because of their race/color (see supra § I.D) and/or Robinson claims he did not receive a raise in early to mid-2022 because of his race/color (see supra n.22 & § I.H), (1) such claims are time-barred (see supra n.1) and, in any event, they have no admissible evidence to support them.

As explained above, DHP suspended Cagle's employment for one week in December 2022

based on its conclusion that he acted in an insubordinate manner during the December 6 meeting.

(See supra § I.O.)  Cagle admits (1) during the meeting, he got up and threatened to leave, (2) Plant

Manager Kailan told him that, if he left the meeting, it would be treated as insubordination and his

employment would be suspended, and (3) notwithstanding Kailan's warning, Cagle left the

meeting.  (See id.)  While Cagle may disagree that he was, in fact, insubordinate, his disagreement

is insufficient to create a triable issue of fact.[47]  And aside from any such disagreement, Cagle has

no admissible evidence even remotely suggesting DHP's reason was false[48] and, as noted above,

---

[47] See Vidal v. Metro-North Commuter R.R. Co., No. 3:12-cv-00248 (MPS), 2014 WL 3868027, at *6 (D. Conn. Aug. 6, 2014) ("mere speculation or disagreement with" legitimate, nondiscriminatory reasons for adverse action are "insufficient" to create issue of fact) (citation omitted); Gomez v. Metro. Dist., 10 F. Supp. 3d 224, 239 (D. Conn. 2014) (a plaintiff's "disagreement with [the defendant's] business decisions does not demonstrate pretext"); Johnson v. Conn. Dep't of Admin. Servs., 972 F. Supp. 223, 257 (D. Conn. 2013) (same); Martinez v. Conn. State Library, 817 F. Supp. 2d 28, 47 (D. Conn. 2011) (citing Fleming v. MaxMara USA, Inc., 644 F. Supp.2d 247, 266 (E.D.N.Y. 2009) ("While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

[48] See, e.g., Bjorkland v. Golub Corp., No. 18cv1271, 2020 WL 902602, at *5 (D. Conn. Feb. 25, 2020) (granting employer summary judgment because "[e]ven if Bjorkland's version is true [that she acted in accordance with company policy,] this does not show that Golub's belief that she did not comply with company policy . . . and later wrote information in the logs to cover her tracks was a pretext for discriminatory animus"), aff'd, 832 F. App'x 97 (2d Cir. 2021); McEvoy v. Fairfield University, No. 17-cv-1861, 2019 WL 5579375 (D. Conn. Oct. 29, 2019), aff'd, 844 F. App'x 420 (2d Cir. Feb. 17, 2021) (affirming summary judgment where plaintiff "failed to marshal evidence that the decisionmakers did not believe that her performance was deficient" (regardless of whether it, in fact, was deficient) because the court is "decidedly not interested in the truth of the allegations against plaintiff,' but rather, 'what motivated the employer.'") (citing McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)); Hazelwood v. Highland Hosp., No. 14-cv-6421, 2017 WL 5904763, at *3 (W.D.N.Y. Nov. 30. 2017) ("court must focus on the perceptions of the decisionmakers"); Stefanidis v. Jos. A. Bank Clothiers, Inc., No. 14-cv-971, 2016 WL 845297, at *7 (D. Conn. Mar. 2, 2016) (granting employer summary judgment, noting "[t]he fact that Mr. Stefanidis now denies using shipping codes improperly . . . does not show pretext.  The purpose of the pretext inquiry is not to determine whether an adverse employment action was fair or wise, but rather to determine whether discrimination was a motivating factor behind such a decision"); Parron v. Herbert, 768 F. App'x

not even Cagle believes discrimination was the real reason (see supra § IV.A.1).

Similarly, while Robinson maintains DHP should have excused some or all his unexcused absences in late July/early August 2022, which resulted in his termination, he (1) admits he was absent on the days in question, and (2) has no specific evidence showing DHP did not believe they were unexcused.  (See supra § I.J.)  Even assuming he did, however, Robinson has no admissible evidence from which a rational factfinder could conclude race/color discrimination was the real reason—a belief even Robinson himself does not hold.  (See supra § IV.A.1.)  And cutting squarely against any such inference are, among other things, the fact that (1) DHP has terminated the employment of sixty four employees for attendance reasons, nearly seventy percent of whom were not African-American/black (see supra n.35), and (2) hired Kittrell (African-American/black) to replace Kailan as the Plant Manager, in charge of the entire facility (see supra § I.A).

### 3.    Plaintiffs' Hostile Work Environment Claims Fail Because They Cannot Show Sufficiently Severe or Pervasive Discriminatory Conduct, Whether Within or Outside Applicable Limitations Period.

"To state a claim for a hostile work environment under [CFEPA], 'a plaintiff must produce evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Chima v. KX Techs., LLC, No. 3:21-cv-00801 (JCH), 2022 WL 596745, at *2 (D. Conn. Feb. 28, 2022) (citing Patino v. Birken Mfg. Co., 304

---

75, 77 (2d Cir. 2016) (affirming summary judgment for employer where employer "proffered a legitimate, non-discriminatory reason for [plaintiff's] suspension – his failure to arrive at work on time and complete assigned tasks;" and "[e]ven if there were a genuine dispute as to whether [plaintiff] had violated company policy, [plaintiff] did not produce any evidence demonstrating that these reasons were pretextual").  Moreover, it is not a Court's role to second-guess DHP's legitimate business decisions in the absence of evidence of discrimination.  See Byrnie v. Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (court's "role is to prevent unlawful [employment] practices, not to act as a superpersonnel department that second guesses employers' business judgments").

Conn. 679, 699 (2012)).[49]  "Whether an environment is objectively hostile is determined by looking at the record as a whole and at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (citation omitted).  "[I]solated incidents of racism that do not involve physical threats are generally not sufficient to state a claim for hostile work environment."  Id. (citing Feliciano v. Autozone, Inc., 316 Conn. 65, 85 (2015)).  "[W]ith respect to offensive slurs . . . [t]here must be more than a few isolated incidents of racial enmity . . . meaning that [i]nstead of sporadic slurs, there must be a steady barrage of opprobrious racial comments . . . . Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs . . . considered cumulatively in order to obtain a realistic view of the work environment."  Id. (citing Schwapp v. Avon, 118 F.3d 106, 110-11 (2d Cir. 1997)).

As a preliminary matter, Plaintiffs' hostile work environment claims fail because they are untimely.  Where Cagle filed his administrative charges on May 5, 2023, only conduct allegedly occurring on or after July 9, 2022 is timely.  (See supra n.1.)  Moreover, where Robinson filed his administrative charges on May 15, 2023, only conduct allegedly occurring on or after July 19, 2022 (just a couple of weeks before his employment was terminated) is timely.  (See id.)  Neither Cagle nor Robinson specifically allege any discriminatory conduct occurring within the applicable limitations period and, accordingly, their hostile work environment claims fail as a matter of law.

That said, even assuming the conduct about which Plaintiffs complain occurred within the

---

[49] "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Mallison v. Conn. Office of Early Childhood, No. 3:21-cv-1641 (SVN), 2022 WL 6771028, at *7 (D. Conn. Oct. 11, 2022). (citing Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)).

applicable limitations periods (and even assuming they subjectively perceived the environment as hostile and abusive—which their own use of racially-derogatory language (see supra § I.L) calls into question), no reasonable factfinder could find the conduct was sufficiently severe or pervasive. The majority of their myriad complaints centers on workplace grievances unrelated to their race/color. The only conduct they allege specifically tied to race/color is their claim that various coworkers referred to them, on a non-specific number of largely non-specific occasions, as "angry black men." (See supra § I.F.) These allegations, while certainly inappropriate as alleged, amount, at best, to "mere offensive utterances" and "sporadic offensive slurs." Cf. Chima, 2022 WL 596745, at *2. They are insufficient as a matter of law to support a hostile work environment claim.[50]

### B.    Plaintiffs' Retaliation Claims (Counts Five and Six).

In Counts Five and Six, Plaintiffs claim DHP retaliated against them in violation of

---

[50] See e.g., Donnelly v. Academic P'Ship LLC, No. 3:20-cv-1106-X, 2023 WL 4033949, at *17-18 (N.D. Tex. Jun. 14, 2023) (granting summary judgment on hostile work environment claim notwithstanding supervisor calling plaintiff an "angry black man" because the "mere utterance of an epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate Title VII"); West v. City of Hartford, No. 3:20-cv-1210 (KAD), 2022 WL 17850357, at *7-8 (D. Conn. Dec. 22, 2022) (granting summary judgment on hostile work environment claim notwithstanding supervisor calling plaintiff an "angry black man," among other things) (citing cases); Atkins v. Walmart, Inc., No. 6:20-cv-1217 (ATB), 2022 WL 1320300, at *13-14 (N.D.N.Y. May 2, 2022) (same); Hayes v. ATL Hawks, LLC, No. 1:17-cv-02510, 2019 WL 13059765, at *11 (N.D. Ga. Dec. 13, 2019) (same); see also Reed v. Procter & Gamble Mfg. Co., 556 F. App'x 421, 433-44 (6th Cir. Feb. 13, 2014) (affirming summary judgment on hostile work environment claim as repeated references to fried chicken and watermelon and asking whether someone holding telephone cord was "fixing to hang someone," while inappropriate, are merely offensive comments or gestures); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity . . . meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments'") (citations omitted); Boutin v. Comcast Cable Commc'ns Mgmt., LLC, No. 3:21-cv-1630 (SVN), 2023 WL 4564375, at *11-12 (D. Conn. Jul. 17, 2023) (granting summary judgment notwithstanding fact that manager played rap song for plaintiff containing ten to fifteen incidents of the n-word because not sufficiently severe or pervasive).

CFEPA. Plaintiffs bring their retaliation claims on a disparate treatment theory. (See Doc. No. 48, Am. Compl. ¶¶ 96 & 101.)

### 1. **Plaintiffs' Retaliation Claims Fail Because Neither Can Show DHP's Reasons for the Adverse Actions at Issue Were False and Pretextual.**

As noted above, the only adverse actions at issue with respect to Plaintiffs' retaliation claims are (1) Cagle's one-week suspension in early December 2022 (for insubordination during the December 6 meeting), and (2) Robinson's termination in early August 2022 (for deficient attendance). Where (1) Cagle alleges he complained about "racial tension," among other times, during the December 6 meeting, and (2) Robinson alleges he complained about "racial tension," among other times, during the week of July 25, DHP assumes, for purposes of this motion only, they can establish a *prima facie* case.[51]

Still, Plaintiffs bear the burden of producing "sufficient evidence upon which a reasonable juror could find that defendant's 'proffered reason [for an adverse action] was merely a pretext for an unlawful motive." See Antunes v. Lowe's Home Ctrs., LLC, No. 3:20-cv-01890 (JCH), 2023 WL 122042, at *4 (D. Conn. Jan. 5, 2023) (citing Bentley v. AutoZoners, LLC, 935 F.3d 76, 88 (2010)). Put differently, Plaintiffs bear the burden of "establishing that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against" them. See id. at *6 (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010)).[52]

---

[51] See Dagenais v. Wal-Mart Stores East, LP, No. 3:23-cv-241 (SVN), 2024 WL 3520395, at *6 (D. Conn. Jul. 23, 2024) (citation omitted) (to make "*de minimis*" *prima facie* case, a plaintiff must show (1) participation in a protected activity, (2) the defendant's knowledge of the protected activity, (3) an adverse employment action, and (4) a causal connection between the protected activity and adverse action).

[52] DHP notes a split of authority appears to exist concerning whether, under CFEPA, a plaintiff, on a retaliation theory, must prove "but-for" or "motivating factor" causation. Compare Dagenais 2024 WL 3520395, at *6 (citing Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013) (applying "but-for" standard) with Antunes v. Lowe's Home Ctrs., LLC, No. 3:20-cv-

According to Plaintiffs, they complained about what they call "racial tension" at DHP, repeatedly, since at least February 2022.  (See, e.g., Ex. 2, Cagle Dep. at 241-42.)  While Cagle alleges he referred to "racial tension" during the December 6 meeting, and Robinson referred to "racial tension" during the week of July 25, such temporal proximity as to the adverse actions at issue is insufficient to satisfy their burden here.  See Dagenais v. Wal-Mart Stores East, LP, No. 3:23-cv-241 (SVN), 2024 WL 3520395, at *8 (D. Conn. Jul. 23, 2024) ("[w]hile timing alone may be a basis for establishing a *prima facie* case, it is not enough to establish pretext at the third stage of the McDonnell Douglas analysis").[53]  And cutting squarely against any inference of retaliation (1) as to Cagle, are the undisputed facts that (a) during the December 6 meeting, Cagle got up and threatened to leave, (b) Kailan told him that, if he left the meeting, it would be treated as insubordination, and (c) notwithstanding Kailan's warning, Cagle left the meeting anyway (see supra § I.O); and (2) as to Robinson, is the undisputed fact that he was absent on the days at issue, and his belief that some or all of these absences should have been excused is immaterial (see supra § I.J).[54]  They have nothing but the coincidence of temporal proximity which, alone, is insufficient to carry their burden.  On this record, no reasonable jury could conclude DHP took the adverse

---

01890 (JCH), 2023 WL 122042, at *6 n.3 (D. Conn. Jan. 5, 2023) (applying "motivating factor" standard).  This split of authority is no moment, however, as Plaintiffs fail to meet either standard.

[53] See also Bidon v. Collins, No. 3:22-cv-00590 (KAD), 2024 WL 934849, at *10 (Mar. 27, 2025) ("timing alone is not sufficient at summary judgment to impute a retaliatory animus or to create an issue of fact regarding pretext"); Wynn v. New Haven Bd. of Ed., No. 3:21-cv-925 (SVN), 2024 WL 1157148, at *12 (D. Conn. Mar. 18, 2024) (at the pretext step, a plaintiff "cannot rely merely on the coincidence of timing") (citing Fu v. Consol. Edison Co. of N.Y., 855 F. App'x 787, 791 (2d Cir. 2021) (summary order) ("unlike at the prima facie stage, [plaintiff] cannot rely on the inferences of timing alone' at step three"); Parson v. Herbert, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order) ("timing alone is insufficient to establish pretext").

[54] See Dagenais, 2024 WL 3520395, at *8 ("'the fact that an employee disagrees . . . or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext' for retaliation") (emphasis added) (citation omitted).

actions at issue because Plaintiffs complained about, among myriad other issues, "racial tension."

### C.    Cagle's Disability Discrimination Claim (Count Seven).

In Count Seven, Cagle claims DHP discriminated against him based on his alleged disability in violation of CFEPA.  He claims disparate treatment, failure to accommodate, and hostile work environment.

#### 1.    Cagle's Disparate Treatment Disability Discrimination Claim Fails Because He Cannot Establish a *Prima Facie* Case.

To prevail on his disparate treatment disability discrimination clam, Cagle first must establish a *prima facie* case by showing, among other things, "he suffered an adverse employment action because of his disability."  See Dimauro v. Wal-Mart Stores East, LP, No. 3:19-cv-1048 (AVC), 2021 WL 6339051, at *5 (D. Conn. Nov. 1, 2021) (citing McMillan v. City of N.Y., 711 F.3d 120, 125 (2d Cir. 2013)).  While this burden is not onerous, Cagle clearly cannot satisfy it. As a preliminary (and, again, dispositive) matter, Cagle testified he does not believe DHP suspended his employment based on his alleged disability:

> Q.    Do you claim that your employment was suspended in December based on your disability?  You think the decision-makers suspended your employment because of your disability?
>
> A.    No, sir.

(See Ex. 2, Cagle Dep. at 270.)  Moreover, the record is utterly devoid of any admissible evidence to support such a claim.  No reasonable jury would disagree with Cagle and find otherwise.

#### 2.    Cagle's Disparate Treatment Disability Claim Also Fails Because He Cannot Show DHP's Reason for His Suspension was Pretextual.

Assuming Cagle could establish a *prima facie* case (as explained above, he cannot), his disparate treatment disability discrimination claim still fails because he has no evidence from which a reasonable jury could find it "more likely than not" his disability was the real reason DHP suspended his employment for one week in early December 2022.  See Dimauro, 2021 WL

- 37 -

6339051, at *7.  None whatsoever.

### 3.   Cagle's Failure to Accommodate Claim Fails Because He Cannot Show DHP Denied Any Accommodation Request, Whether Within or Outside Applicable Limitations Period.

To survive summary judgment on a failure to accommodate claim, Plaintiff must produce enough evidence for a reasonable jury to find (1) he is "disabled," (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) DHP, despite knowing of his disability, did not accommodate it.  See Begin v. Becton, Dickson & Co., No. 3:21-cv-1329 (VAB), 2023 WL 5177908, at *11 (D. Conn. Aug. 11, 2023) (citing Curry v. Allan S. Goodman, Inc., 286 Conn. 390, 415 (2008)).

Where Cagle filed his CHRO charge on May 5, 2023, only accommodation denials, if any, occurring on or after July 9, 2022 are timely.  See Clark v. Stop & Shop Supermkt. Co., No. 3:15-cv-00304 (JCH), 2016 WL 4408983, at *6 (citing Elmenaver v. ABF Freight Sys., Inc., 318 F.3d 130, 134-35 (2d Cir. 2003) ("an employer's rejection of an employee's request for a reasonable accommodation is a 'discrete act' that triggers the running of the statute of limitations for a failure to accommodate claim")).  Moreover, where Cagle received a release of jurisdiction from the CHRO on November 3, 2023 (see Doc. No. 48, Am. Compl. Ex. 1), only accommodation denials, if any, occurring before that date are properly before this Court.[55]

---

[55] Indeed, to the extent Cagle claims DHP failed to accommodate his alleged disability after the CHRO released jurisdiction (see Doc. No. 48, Am. Compl. ¶¶ 66-68; Ex. 2, Cagle Dep. at 270-73), (1) he has not exhausted his administrative remedies with respect to such claims; see Jones v. Sansom, No. 3:21-cv-00442 (VAB), 2022 WL972445, at *5 (D. Conn. Mar. 31, 2022); and/or (2) such claims, based on discrete acts, are not "reasonably related" to the claims at issue before the CHRO insofar as they were not "carried out in precisely the same manner" as those alleged in Cagle's CHRO charge; see Gadbois v. Cumberland Farms, Inc., No. 3:21-cv-1509 (SVN), 2024 WL 4226908, at *12 (D. Conn. Sept. 18, 2024) (citation omitted).    Indeed, these allegations surfaced for the first time in Plaintiff's Amended Complaint, which he just filed on March 28, 2025.  (See Doc. No. 48, Am. Compl.)  Accordingly, DHP was not afforded a reasonable

Cagle's failure to accommodate claim essentially boils down to his claim that he needed "better" training, from coworkers who speak English well and/or are willing to slow down their hand gestures and demonstrations.[56]  (See Doc. No. 48, Am. Compl. ¶¶ 26 & 33; Ex. 2, Cagle Dep. at 30-34, 39-41, & 267-70.)  According to Cagle, when he told Bolognese, Bolognese attempted to address the issue with the trainers, and they eventually, in Cagle's view, improved.  (See supra n.10.)  While this allegation is largely just a repackaging of Cagle's claim that, in his view, his trainers did not speak English well enough for him, DHP never denied any request for accommodation.  Cagle's failure to accommodate claim, therefore, has no merit.

### 4.  Cagle's Hostile Work Environment Claim Fails Because He Cannot Show Sufficiently Severe or Pervasive Discriminatory Conduct, Whether Within or Outside the Applicable Limitations Period.

Cagle's disability-based hostile work environment claim is evaluated under the same standard as his race/color-based hostile work environment claim.  See Grande v. Hartford Bd. of Ed., No. 3:19-cv-00184 (KAD), 2021 WL 231134, at *5 (D. Conn. Jan. 21, 2021) (citations omitted).  "[A] hostile work environment claim requires more than just a hostile work environment—it requires proof that hostile acts were based on plaintiff's protected status (e.g., his disability), rather than other reasons."  Id.  Cagle has no admissible evidence even remotely suggesting any hostile environment he claims to have experienced had anything to do with his alleged disability.

---

opportunity to conduct discovery with respect to these allegations and the Court should disregard them.

[56] When asked at his deposition who he claims discriminated against him based on his alleged disability (poor vision), he initially identified only Kalpesh and Narendra and later threw Signore into the mix. (See Ex. 2, Cagle Dep. at 30-33 & 267-70.)  According to Cagle, (1) Kalpesh and Narendra did not slow down their demonstrations even after Cagle gestured to them that he had vision issues, and (2) Signore, at various unspecific points, said he has "been there long enough" and "should be able to observe and fully comprehend what's going on."  (See id.)

## V.    <u>CONCLUSION</u>

For any and all of the foregoing reasons, the Court should grant DHP's motion for summary judgment in its entirety.

DEFENDANT
DURO-HILEX POLY, LLC

By its attorneys,


 /s/ Jeffrey A. Fritz
Jeffrey A. Fritz, ct26667
Monica Snyder Perl (admitted *pro hac vice*)
FISHER & PHILLIPS LLP
200 State Street, 13th Floor
Boston, Massachusetts 02109
(617) 722-0044
*jfritz@fisherphillips.com*
*mperl@fisherphillips.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 /s/ Jeffrey A. Fritz
Jeffrey A. Fritz