**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TEVIN CAGLE & GERALD ROBINSON | : | CIVIL ACTION NO. 3:24-cv-00154 (JCH) |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DURO-HILEX POLY, LLC | : | |
| | : | |
| Defendant | : | MAY 9, 2025 |

**PLAINTIFF'S OBJECTION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     Plaintiffs have established a prima facie case for disparate treatment race/color discrimination and have provided evidence of pretext.**

Plaintiffs' complaint is brought in seven counts alleging: race discrimination (Counts One and Two),

color discrimination (Counts Three and Four), retaliation (Counts Five and Six) and disability

discrimination in violation of Conn. Gen. Stat. § 46a-60(b)(1) and (4).  Conn. Gen. Stat. § 46a-60(b)

provides in pertinent parts:

It shall be a discriminatory practice in violation of this section:

(1) For an employer, by the employer or the employer's agent, … to discharge from employment any individual or to discriminate against any individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, .. present or past history of … physical disability, including, but not limited to, blindness…;

[…]

(4) For any … employer, … to discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84[.]

In discrimination claims pursuant to Conn. Gen. Stat. § 46a-60, Connecticut generally follows the

burden-shifting framework adopted by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973).  The burden shifting framework established in *McDonnell* states that:

In order for the employee to first make a prima facie case of discrimination, the plaintiff must show: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4)

the adverse employment action occurred under circumstances that give rise to an
inference of discrimination.

*McDonnell Douglas Corp. v. Green*, 41 U.S. at 802.

Once the plaintiff establishes a prima facie case of discrimination, the employer may then rebut the

prima facie case by stating a "legitimate, nondiscriminatory justification for the employment decision in

question. . . . The employee then must demonstrate that the reason proffered by the employer is merely a

pretext and that the decision actually was motivated by illegal discriminatory bias." *Feliciano v.*

*Autozone, Inc.*, 316 Conn. 65, 74 (2015) (Citations omitted; internal quotation marks omitted.).

Defendant's memorandum claims that Plaintiffs cannot establish a prima facie case for disparate

treatment discrimination.   (Defendant's Memorandum, p. 29-30).   Defendant's argument is without

merit.   Plaintiff have presented evidence that for the majority of the time that they were employed by

Defendant, that they were the only two black/African-American employees, and that the majority of few

other black employees who were employed by Defendant during that time left the company because of

similar mistreatment and discrimination.   Plaintiff have also presented evidence that commencing in

early 2002 they were referred to routinely by multiple co-workers as "angry black men," or other

disparaging terms for black men.  This included at least one instance that occurred directly in the presence

of Production Manager Richard Bolognaise, with no repercussions to the employee who used the slur.

Plaintiffs have presented evidence of co-workers who were not authorized to make changes, who were

generally the same co-workers of referred to them as "angry black men," to their machines routinely

made changes to their machines without permission in order to sabotage the machines.   Plaintiffs have

presented evidence that they made verbal complaint regarding this to management and human resources

on multiple occasions, but no disciplinary action was taken against the co-workers engaging in these

behaviors. Plaintiffs, however, were targeted for multiple write ups, suspension, and in Robinson's case

termination[1] for relatively minor violations, such as attendance violations, which certainly do not rise to

---

[1] It is also notably, that following the close of discovery, and after Plaintiff's deadline to file an amended complaint, and shortly before Defendant's motion was due, Plaintiff Cagle was terminated from employment.  However, such

the same level of severity, as the egregious racial hostility to which Plaintiff's were subjected.

Defendant next claims that Plaintiff has failed to present sufficient evidence to demonstrate that Defendant's proffered reasons for adverse employment actions were pretext. Connecticut's Appellate Courts, which are the binding court decision interpreting Connecticut's Fair Employment Practice Act[2], have held:

> To prove pretext, the plaintiff may show by a preponderance of the evidence that [the defendant's] reason is not worthy of belief or that more likely than not it is not a true reason or the only true reason for [the defendant's] decision to [terminate the plaintiff's employment] . . . . Of course, to defeat summary judgment . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but **only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors**. … A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable [fact finder] could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Eldridge v. Hospital of Central Connecticut*, 230 Conn. App. 666, 672, 330 A.3d 604 (2025) (internal citations and quotations omitted) (emphasis added).

In this case, Defendant's claimed reason of "insubordination" for suspending Cagle are manufactured by Defendant.   Cagle was the one how had asked for the December 6, 2022 meeting in order to address multiple issues – including racial tension and racial discrimination in the workplace – that had gone unaddressed by Bolognese and Signore for a period of 16 months.   In compliance with Defendant's "Open Door Policy," Cagle expressly requested that the meeting be held without Bolognese and Signore. Korzenko and Kailan, however, disobeyed the "Open Door Policy," and refused Cagle's request for a private meeting with only them.   Although the meeting was initially calm, when Cagle raised his concerns regarding being targeted, and racial tension, Korzenko began yelling at Cagle to "Stop!" and

---

allegations are not part of the operative complaint.   Following disposition of Defendant's motion, Plaintiff may seek leave to amend the complaint to include facts related to his termination.

[2] Plaintiff's claims are brought pursuant to Connecticut's Fair Employment Practices Act (CFEPA), and as such are government by the decision of Connecticut's Supreme Court and Appellate Court interpreting that act.   Defendant's memorandum, however, relies almost entirely upon federal cases interpreting similar federal statutes or U.S. District Court cases.   To the extent that federal decisions interpreting CFEPA, is inconsistent with Connecticut's appellate court decision, Connecticut's appalled level decision are controlling.

refused to listen to him, insisting that he instead allow Kailin to speak.   Korzenko was the one who
escalated tension in the room by yelling at Cagle, specifically in response to his complaints regarding
racial discrimination.

As a result of Korzenko's conduct, Cagle felt uncomfortable and wished to avoid escalation or further
confrontation and attempted to leave the meeting.  However, Korzenko and Kailin claimed that he was
being insubordinate in attempting to leave, and threatened that if he left, he would be suspended. Plaintiff
felt targeted and given the prevalence of the "angry black man" stereotype that Defendant allowed to
flourish within its facility, Cagle was afraid that if the situation escalated, that he would be further
blamed, and discriminated against. Therefore, to avoid further escalation and confrontation, he left.
Despite the fact that the meeting had been called to address Cagle's concerns, Cagle was the one who was
threatened when he attempted to end the meeting he had called because he was being disrespected,
intimidated and threatened.   Thereafter, Defendant followed through on their threat and suspended him
for one week without pay.

Defendant's actions were in violation of its own Open Door Policy.   It was also in violation of its
progressive discipline policy, which typically requires prior warnings before moving to suspension.
Moreover, Cagle's testimony demonstrates that Defendant's action was not motivated by any legitimate
disciplinary concern, but rather by anger and a desire for retaliation at Cagle's continuing to raise
concerns regarding the racial hostility in the workplace.

## II.    Plaintiffs' hostile work environment claims are timely.

Defendant argues that Plaintiffs' hostile work environment claims are not timely, arguing that the
only factual allegations that can support their hostile work environment claims are those that occurred
within 300 days of Plaintiffs having filed their CHRO claims.  (Defendant's Memorandum, p. 33).
Defendants' argument is without merit, as Connecticut adheres to the continuing violation doctrine in
hostile working environment claims.  As reasoned by one Superior Court:

> A hostile work environment is a continuing violation. "Hostile environment claims are
> different in kind from discrete acts. Their very nature involves repeated conduct . . . The
> 'unlawful employment practice' therefore cannot be said to occur on any particular day. It

4

occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own . . . A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' 42 U.S.C. §2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Chouhan v. University of Connecticut Health Center*, Docket No. CV096002439S, 2013 Conn. Super. LEXIS 2555, at *30-31 (Super. Nov. 5, 2013) (internal quotations and citations omitted).  *See also,* Slowik v. Morgan Stanley & Co., 2006 Conn. Super. LEXIS 2519, *14-15 (discussing Connecticut's history of applying the continuing violation principle).

In this case, Plaintiffs presented evidence that they were called "angry black men, on a near daily basis and remained ongoing.  Robinson was terminated from employment August 3, 2023, and his CHRO claims were brought well within 300 days of that date.   Cagle remained employed with Defendant until recently, and testified that the last time, prior to his deposition, that he was called an "angry black man" was in the "end of 2022, so around anywhere from the beginning of November to the end of December." (Ex B, Cagle Depo, p. 286-287).   Additionally, Cagle testified hostility to his racial complaints from Korzenko, and relation, in the form of suspension, in direct response to his making those complaints occurring in December 2022.  As such, Cagle's CHRO complaint was also brought well within the statute of limitations.

III.    **Plaintiffs were subjected severe and pervasive racial stereotyping as "angry black men," which was tolerated by management and allowed to flourish by management.**

The Connecticut Appellate Court has held:

In order for the plaintiff "[t]o establish a claim of hostile work environment, [under § 46a-60 (a) (1)] the workplace [must be] permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe **or** pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment . . . . In order to be actionable . . . [the working] environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the [plaintiff] in fact did perceive to be so. . . . [W]hether an environment is sufficiently hostile or abusive [is determined] by looking at all the circumstances . . . ."

*Heyward v. Judicial Dept. of Connecticut*, 178 Conn. App. 757, 764, 176 A.3d 1234 (2017)

(emphasis added).

Importantly, Connecticut's hostile work environment test is disjunctive, requiring either that the

workplace conduct be sufficiently severe, or sufficiently pervasive.   Plaintiff need not show both.

Additionally, courts have recognized that in some circumstances even a sign use of racial slurs, or other

severe behaviors, are sufficient to constitute a hostile working environment. Applying the same

disjunctive test, then-Judge (now-Supreme Court Justice) Brett Kavanaugh reasoned:

> [S]aying that a single incident of workplace conduct *rarely* can create a hostile work
> environment is different from saying that a single incident *never* can create a hostile work
> environment. The test set forth by the Supreme Court is whether the alleged conduct is
> "sufficiently severe *or* pervasive" — written in the disjunctive — not whether the
> conduct is "sufficiently severe *and* pervasive." A single, sufficiently severe incident, then,
> may suffice to create a hostile work environment.
>
> Courts and commentators alike agree that a single physical act — such as a *physical*
> assault — can create a hostile work environment. *See, e.g., Turnbull v. Topeka State
> Hospital*, 255 F.3d 1238, 1243 (10th Cir. 2001) (case concerning sexual assault where
> court stated: "Because frequency is merely one factor in the analysis, an isolated  incident
> may suffice if the conduct is severe and threatening."); *Smith v. Sheahan*, 189 F.3d 529,
> 534 (7th Cir. 1999) ("'extremely serious' acts of harassment" like physical assault may be
> severe and need not also be pervasive) (quoting *Faragher v. City of Boca Raton*, 524 U.S.
> 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)); *Tomka v. Seiler Corp*., 66 F.3d
> 1295, 1305 (2d Cir. 1995) ("even a single incident of sexual assault sufficiently alters the
> conditions of the victim's employment and clearly creates an abusive work environment
> for purposes of Title VII liability"), *abrogated on other grounds by Burlington Industries,
> Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); 3 Lex K. Larson,
> Employment Discrimination § 46.05[3][b] (2d ed. 2012) ("a single incident of physical
> assault against a co-worker that is motivated by anti-female animus can qualify as severe
> enough to constitute an alteration of the co-worker's conditions of employment").
>
> As several courts have recognized, moreover, a single *verbal* (or visual) incident can
> likewise be sufficiently severe to justify a finding of a hostile work environment. *See,
> e.g., Reedy v. Quebecor Printing Eagle, Inc*., 333 F.3d 906, 909 (8th Cir. 2003) (racially
> hostile graffiti that amounted to death threat qualifies as "severe"); *Richardson v. N.Y.
> State Dept. of Correctional Service*, 180 F.3d 426, 437 (2d Cir. 1999) (case involving the
> use of several racial epithets and insults where court stated: "even a single episode of
> harassment, if severe enough, can establish a hostile work environment"), *abrogated on
> other grounds by Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct.
> 2405, 165 L. Ed. 2d 345 (2006); *cf. Jackson v. Flint Ink North American Corp*., 370 F.3d
> 791, 795 (8th Cir. 2004) ("Even a single instance of workplace graffiti" involving a
> burning cross, "if sufficiently severe, can go a long way toward making out a Title VII
> claim"), *rev'd on reh'g on other grounds*, 382 F.3d 869 (8th Cir. 2004).
>
> It may be difficult to fully catalogue the various verbal insults and epithets that by

themselves could create a hostile work environment. And there may be close cases at the margins. But, in my view, being called the n-word by a supervisor … suffices by itself to establish a racially hostile work environment. That epithet has been labeled, variously, a term that "sums up . . . all the bitter years of insult and struggle in America," Langston Hughes, The Big Sea 269 (2d ed. 1993) (1940), "pure anathema to African-Americans," *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and "probably the most offensive word in English," Random House Webster's College Dictionary 894 (2d rev. ed. 2000). *See generally* Alex Haley, Roots (1976); Harper Lee, To Kill a Mockingbird (1960). Other courts have explained that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of . . . 'nigger' by a supervisor in the presence of his subordinates." *Spriggs*, 242 F.3d at 185. No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.

*Ayissi-Etoh v. Fannie Mae*, 404 U.S. App. D.C. 291, 299, 712 F.3d 572 (2013).

In this case, Plaintiff's have present evidence – material facts which Defendant's utterly omitted from their memorandum – of both a severe and pervasive culture of racial hostility in their workplace. Plaintiffs' evidence shows that they were initially referred to "angry black men," by a co-worker in the presence of a manager, specifically Richard Bolognese, who failed to any action in the moment and never took any action address this despicable racial stereotyping.

Following that, Plaintiffs have presented evidence that they were subjected to near daily verbal racially derogatory stereotyping of being called "angry black men."   At their deposition Plaintiffs recounted no fewer than <u>thirteen</u> separate incidents where they were called "angry black men," in a period of less than a year.  In Robinson's case, the harassment included at least once instance where his Shift Lead, Kalpesh, escalated to assaulting him but poking him in the chest.  Plaintiffs have presented evidence that they complained about the racial tension in the workplace to supervisors, and that they specifically raised the issue of being called "angry black men," with <u>two</u> corporate human resources representatives, who took no action investigate Plaintiff's claims of racial discrimination.   Despite the severity and pervasiveness of the environment no one was ever held to account for these despicable actions.   None of the employees who called them "angry black men" were ever warned, discipline or terminated for their conduct.  They were not even sent to any racial sensitivity training or non-disciplinary avenues of redress. (See, Plaintiff's Rule 56(a)2 Statements, 32-34; and Plaintiff's Additional Material

Facts, ¶ 29-48, 72-74, and 78).

Moreover, the Plaintiff were subjected to acts of sabotage of their machines by the same people

who referred to them as "angry black men."  Specifically, several of Plaintiffs' packer co-worker who

referred to them as angry black men, to repeated interference with Plaintiffs' work, my making

unauthorized modifications to Plaintiff's machines, which lead to errors, machine shutdowns and product

waste.  (See, Plaintiff's Rule 56(a)2 Statements, ¶ 15; and Plaintiff's Statement of Additional Facts, ¶ 17-

20).

As such, Defendant's argument that the racial tension, and repeated racially slurs and stereotypes

to which they were subjected, were not sufficiently severe or pervasive to be considered a "hostile work

environment," is utterly without merit.

IV.    **Plaintiffs have presented sufficient evidence of pretext with regard to their retaliation claims.**

Defendant argues that Plaintiffs cannot meet their burden to show evidence from which a

reasonable jury could conclude that Defendant's adverse actions against them were pretextual.  As

discussed above:

> To prove pretext, the plaintiff may show by a preponderance of the evidence that [the
> defendant's] reason is not worthy of belief or that more likely than not it is not a true
> reason or the only true reason for [the defendant's] decision to [terminate the plaintiff's
> employment] . . . . Of course, to defeat summary judgment . . . the plaintiff is not required
> to show that the employer's proffered reasons were false or played no role in the
> employment decision, but **only that they were not the only reasons and that the
> prohibited factor was at least one of the motivating factors**. … A plaintiff may show
> pretext by demonstrating such weaknesses, implausibilities, inconsistencies,
> incoherences, or contradictions in the employer's proffered legitimate reasons for its
> action that a reasonable [fact finder] could rationally find them unworthy of credence and
> hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Eldridge v. Hospital of Central Connecticut*, 230 Conn. App. 666, 672, 330 A.3d 604 (2025) (internal

citations and quotations omitted) (emphasis added).

The discussion of pretext in relation to Plaintiff's retaliation claims, largely overlaps with the

discussion in relation to plaintiff's disparate treatment claims discussed in Section I, above. (See p. 3-4).

First, as noted by Defendant there is temporal proximity between the Plaintiffs' complaints related to

racial discrimination, and the adverse employment actions.   Robinson made complaint related to racial tension on multiple occasions, and prior to his termination had made such complaint merely a week before.   Cagle also had made multiple complaints regarding the hostile racial environment and began to make similar complaints within the December 6, 2022 meeting when Korzenko interrupted him, yelled at him to stop in relation to his complaints.  AS a result of Korzenko's hostility and escalation, and in fear of the prevalent stereotype of the "angry black man" that had been permitted to permeate the facility, Cagle attempted to de-escalate the situation by leaving the meeting – a meeting that he had requested.  He was immediately threatened with suspension if he left the meeting for no legitimate purpose, but rather in anger for him once again having raised his concerns regarding the racial hostility in the facility.  When Cagle, in an effort to de-escalate, did, in fact, leave the meeting he was suspended the next day.  Such, actions on Defendants' part are clear evidence of pretext.

Given the severe and pervasive racial hostility within the Plaintiffs' workplace, their repeated complaints regarding such hostility, the Defendant's utter failure and unwillingness to take any action to resolve the complaint or improve the environment, the temporal proximity of events, and the swift and over anger that was expressed by Defendant's Human Resources representative, a reasonable jury could conclude that Defendants were looking for any excuse to retaliate against Plaintiffs and they found them. Based upon the accumulated evidence, a reasonable jury could very easily conclude that Defendant's proffered reasons for adverse employment action against Plaintiffs were pretextual.

## V.    Cagle's Disability Discrimination Claims Are Timely.

Defendant claims that Plaintiff's disability discrimination claims regarding failure to accommodate are untimely.  Defendant relies upon the same inaccurate assessment of the statute of limitations as discussed in relation to Plaintiffs' race discrimination claims.  As indicated above, Connecticut has adopted the continuing violation principle.  With regard to Plaintiff's disability claims, Defendant' adverse actions against him including failure to adequately train, and failure to provide him with training in a method his could comprehend given is visual disability.  As discussed in Plaintiff's Rule 56(a)2 Statement and Additional Material Facts.  Cagle has a disorder of the nerve that connects his

eyes and his brain, which causes extremely poor vision such that he is considered legally blind in the State of Connecticut.  As such, having clear verbal instruction is especially important to Cagle, as he is limited in his ability to follow physical demonstrations and hand gestures.  Cagle disclosed his disability in his interviews and when he was promoted to Machine Operator, and to his trainers.  However, his trainers, including Narendra, at least initially completely refused to speak English with him, subjecting him entirely to hand gestures.   Moreover, even once his trainers began using English – albeit broken English – they refused to slow the machines, or stop the machines, or slow their hand gestures to enable Plaintiff to be able to better follow their instruction.  As testified to by Cagle, this went on for months and required him to complain multiple times before there was any improvement.

Moreover, Defendant's adverse actions included setting him up to fail by requiring him to run his machine at an excessive speed without the assistance of a packer.  Plaintiff Cagle is the only machine operator on his shift who does not have the assistance of a packer on his machine.  Plaintiff Cagle's supervisors, have insisted that he run his machine at a rate of 200 or higher. However, due to his visual deficiency, Plaintiff Cagle cannot safely and accurately run the machine at a rate of 200 or better without a packer.   Plaintiff Cagle has complained regarding this issue to his supervisors, including Signore and a new plant manager, known to Plaintiff Cagle as "Tony."   In particular, Plaintiff Cagle has indicated that he either needs a packer to assist in running the machine (like all other machine operators have to assist them), or he needs to be permitted to run the machine more slowly to run it alone.  Cagle indicated that these vents had occurred shortly before his deposition, which occurred in November 2024.  (Ex B, Cagle Depo, p. 253-254).

As such, Cagle's disability discrimination claim is timely.

**VI.    Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

PLAINTIFFS,
TEVIN CAGLE AND GERALD ROBINSON

BY:     */s/ Rebecca M. Harris*
        Rebecca M. Harris, Esq. (ct 26669)
        Harris Law, LLC
        15 N. Main St., Suite 100
        West Hartford, CT 06107
        Tel. (860) 590-7167
        Email: rharris@harrislawct.com

11

## CERTIFICATION OF SERVICE

I hereby certify that on May 9, 2025 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/  Rebecca M. Harris*
Rebecca M. Harris